Gants, J.
The Commonwealth of Massachusetts has petitioned this Court to commit the respondent, Christopher Reese, as a sexually dangerous person under G.L.c. 123A. A probable cause hearing was conducted on March 26, 2001 as required under G.L.c. 123A, § 12(c), at which the Commonwealth called one expert witness, Dr. William B. Land. The Commonwealth offered into evidence the police reports and Department of Social Services file regarding Reese’s prior convictions for a sexual offense, his Board of Probation record, and a Psychosocial Assessment and Dispositional Plan for Christopher Reese prepared by Joan Katz, a licensed social worker who is the Director of Social Services for the Committee for Public Counsel Services.[1] Reese offered into evidence three learned treatise articles on the subject of predicting recidivism *196 by sexual offenders. The Commonwealth objected to the admission of any such learned treatise articles and has filed a motion to strike these articles, but on March 28, 2001 provisionally offered four additional learned treatises on the subject of sexual recidivism to be considered in the event the Court denied its motion to strike. Having considered the testimony at the probable cause hearing and the exhibits offered into evidence at that hearing, this Court finds that there is not probable cause to believe that Reese is a sexually dangerous person as defined in G.L.c. 123A, §1. Since Reese has completed his term of imprisonment and is being held in custody only as a result of this petition, this Court ORDERS that Reese be released from custody forthwith and commence his term of probation.
“Probable Cause” Under the “Directed Verdict" Standard
In Commonwealth v. Bruno, the Supreme Judicial Court declared that the “sufficient showing” that permits a Court temporarily to detain a respondent who is scheduled to be released from prison is probable cause to believe that the respondent is a sexually dangerous person within the meaning of meaning of G.L.c. 123A, §1. 432 Mass. 489, 510-11 (2000). The Supreme Judicial Court in Bruno also declared that the standard for a “probable cause” hearing under G.L.c. 123A, § 12(c) is not the probable cause standard but rather the “directed verdict" standard used in probable cause bind-over hearings under G.L.c. 276, §38. Id. at 510. Before this Court can consider whether the evidence at the probable cause hearing supports a finding of “probable cause” under the “directed verdict” standard set forth in Bruno, this Court must first determine what the “directed verdict” standard is and how it compares to the traditional probable cause standard.
In Bruno, the Supreme Judicial Court both quoted and cited with approval the case of Myers v. Commonwealth, 363 Mass. 843 (1973), which interpreted the meaning of probable cause in the context of a District Court hearing to bind over to the Superior Court a defendant accused of serious felonies. Bruno, 432 Mass. at 509-10. From Myers, one can discern that the determination under G.L.c. 123A, § 12(c) of whether probable cause exists to believe that the defendant is a sexually dangerous person:
requires more evidence than probable cause to arrest but less than proof beyond a reasonable doubt; Myers at 850; Bruno at 510;
requires the factfinder to evaluate the credibility of witnesses and the quality of the evidence introduced; Myers at 853; and
is analogous to the court’s ruling on a motion for a directed verdict in that “(t]he examining magistrate should view the case as if it were a trial and he were required to rule on whether there is enough credible evidence to send the case to the jury.” Id. at 850.
It is plain from Myers that the “directed verdict” standard is simply “analogous” to the civil directed verdict standard and not identical to it. Id. If the standards were identical, it would require the factfinder at a probable cause hearing under G.L.c. 123A, § 12(c) to view the evidence in the light most favorable to the prosecution and determine whether the evidence viewed in that light is sufficient reasonably to support a finding that the defendant is a sexually dangerous person. See Cambridgeport Savings Bank v. Boersner, 413 Mass. 432, 438 (1992). Under the traditional directed verdict standard, the court is not permitted to weigh the credibility of the witnesses or otherwise consider the weight of the evidence. Id. If this civil “directed verdict” standard were to be used in probable cause determinations under G.L.c. 123A, § 12(c), probable cause could be found in cases that would not pass muster under the traditional probable cause standard because the court is permitted to consider credibility when it determines traditional probable cause and would be barred from this consideration in determining “directed verdict” probable cause. This would mean that a court, on identical evidence, could find that there was not traditional probable cause to justify temporary detention but that there was “directed verdict” probable cause to hold the defendant in the treatment center pending trial. Indeed, it would mean that a court must find probable cause to believe the defendant to be sexually dangerous whenever the Commonwealth presents evidence, regardless of how incredible, that would be sufficient, if believed, to find beyond a reasonable doubt that the defendant is a sexually dangerous person. In Myers, the Supreme Judiciad Court made it clear that this would not be enough to bind over a defendant to Superior Court: there must be "credible evidence” sufficient to permit a rational trier of fact to find the defendant guilty. Myers at 850.
Therefore, this Court concludes that the “directed verdict” standard of probable cause set forth in Bruno requires this Court first to determine the evidence it finds credible and then, considering only that credible evidence, determine whether a reasonable trier of fact could find the defendant beyond a reasonable doubt to be a sexually dangerous person based on that credible evidence.
Findings of Fact
Reese is a 31-year-old male who has been in custody since August 1, 1997. On July 31, 1997, at roughly 11:15 p.m., the mother of one of the child victims telephoned the police to report a sexual assault against one of her sons. She reported that Reese was homeless and had been staying in a trailer on her property. Reese would babysit her two sons, “R,” age eight, and “C,” age two. R had told his mother that Reese pulled Reese’s pants down and placed R’s hands on Reese’s penis. R also told his mother that Reese would pull his pants down and play with himself in *197 front of the two children. R also said that Reese, while watching television with R, would take R’s hands and place them on his penis. During the Sexual Assault Intervention Network (“SAIN”) interview, R said that Reese would take R’s hand and “put it on his private spot.” Reese would also push R’s face down to Reese’s private parts and “tried to make me kiss it,” but R would pull his head away. R also said that Reese would pull Reese’s pants down and show his private parts to them. Reese in front of them would also go “up and down on his private spot with his hands.” Reese said that Reese tried to touch him but “I kicked him.” R also said that Reese always drinks beer, and that Reese had hit him with a rake and a broom, but left no marks or bruises.
Another woman living in that same home reported that her ten-year-old daughter had said that Reese, while babysitting, was changing in the bedroom with the door open, and was breaking -her daughter’s things, calling her a bitch, and showing her his middle finger. The ten-year-old girl, S, told her mother that she saw Reese’s penis when she walked by the room. During the SAIN interview, S said that Reese “kept trying to touch me,” including her private parts, but she would not let him. She also said that Reese would grab her hand and put it near his private parts, but she would pull away. She also said that Reese about four times would “moon us,” “flash us with his private parts,” pull his pants down. She said this began in July 1997 and ended with his arrest.
S’s mother reported that Reese had lived with her younger brother for four years with no apparent problems. She said that he lived there since July 1997, about a month, and that they .had left him a few times to babysit.
Reese was indicted on two counts of indecent assault and battery of a child under 14 years old (one count alleging his misconduct towards S and the second his misconduct towards R), and one count of assault with intent to rape with respect to R.[2] On June 24, 1998, after 329 days in custody, Reese pleaded guilty to all three indictments and was sentenced to a total of four years in the House of Correction, to be followed by a five-year period of probation, with four special conditions: 1) sex offender treatment; 2) no contact with minors under 16; 3) no contact with the victims; and 4) alcohol and/or drug treatment.
Reese has a significant criminal record, but no record of violence. He had a juvenile adjudication in 1985 for larceny from a motor vehicle, for which he received probation. As an adult, he was convicted of breaking and entering with intent to commit a felony in 1987, 1988, and 1992, malicious destruction of property in 1990, and possession of cocaine in 1993. He also has been convicted of operating under the influence of alcohol, operating to endanger, and operating with a suspended license. The charges regarding the July 1997 sexual misconduct were the first allegations of sexual misconduct. Nor is there any evidence in the probable cause record of any other sexual misconduct.
Reese has a history of drug and alcohol abuse and, as shown above, there is evidence that he was drinking in July 1997 when the sexual misconduct occurred. He has been to a number of treatment programs, including Alcoholics Anonymous, but without any enduring success. The social worker who interviewed him prior to his sentencing in 1998 observed that he appeared to be clinically depressed. Reese himself was molested as a child over a three-month period by a young man who lived next door to him. He was diagnosed with a learning disability in school, and had some unspecified behavior problems. He left school in the ninth grade and worked a number of short-term jobs. Social worker Katz recommended to the Court at the time of sentencing that Reese be sentenced to a house of correction rather than prison because “he is so passive and withdrawn that he will become an object of the aggressive and sadistic nature of some inmates.” She declared, “He is neither hardened nor particularly street smart. I am uncertain as to his ability to defend himself.” The Court apparently concurred with her evaluation enough to impose two on and after two-year terms in the House of Correction.
Conclusions of Law
To be found a sexually dangerous person as defined in G.L.c. 123A, §1, the Commonwealth must meet its burden of showing that Reese (1) has been convicted of a sexual offense, as defined in G.L.c. 123A, §1; (2) suffers from a “mental abnormality or personality disorder”; and (3) that this mental abnormality or personality disorder makes him “likely to engage in sexual offenses if not confined to a secure facility.”[3] There is no dispute that Reese, having been convicted of two counts of indecent assault and battery on a child under 14 and one count of assault with intent to rape a child under 16, has been convicted of a sexual offense. With respect to the second and third elements, however, the Commonwealth’s case rests solely on the testimony of its expert, Dr. Land, who opined that Reese suffered from both a mental abnormality and a personality disorder that made him likely to engage in sexual offenses if not confined to a secure facility.
Dr. Land is Board certified in psychiatry, with subspecialty certifications in forensic psychiatry, geriatric psychiatry, and addiction psychiatry. From 1992 through 1999, he was a supervisor in the Department of Psychiatry at Beth Israel Hospital, a consulting psychiatrist with the Massachusetts Rehabilitation Commission, and a staff psychiatrist at Bridgewater State Hospital. During this time period, he also worked for roughly two years at the Massachusetts Treatment Center at Bridgewater for Sexually Dangerous Offenders, and treated roughly 200 sexual offenders.
*198 Does Reese Suffer from a Mental Abnormality?
Dr. Land opined that Reese suffered from a single mental abnormality — pedophilia.[4] Pedophilia is defined in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, published in 2000 by the American Psychiatric Association, commonly referred to as DSM-IV. (In this decision, this Court shall cite it as DSM-IV-TR, to make clear that the Court is referring to the Text Revision published in 2000 and not the earlier DSM-IV published in 1994). Dr. Land’s finding that Reese was a pedophile was based solely on Reese’s sexual offenses in July 1997; he did not interview him or examine any psychiatric or psychological records apart from the psychosocial assessment of the CPCS social worker.
The DSM-IV characterizes pedophilia as a type of Paraphilias, which is a general category of sexual disorder. “The essential features of a Paraphilia are recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or other non-consenting persons, that occur over a period of at least six months.” DSM-IV-TR at 566. For all Paraphilias other than sexual sadism, “the diagnosis is made if the behavior, sexual urges, or fantasies cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.” Id.
The “diagnostic criteria” for pedophilia, according to DSM-IV, are:
Over a period of at least 6" months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger).
The person has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.
The person is at least age 16 years and at least 5 years older than the child or children in Criterion A.
DSM-IV-TR at 572. Dr. Land concedes that there is no evidence that Reese had “recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children” beyond the time period of his babysitting for R and S, which had a duration of only one month. He also concedes that, as a result, Reese cannot be said to fit the DSM-IV diagnostic criteria for pedophilia, and therefore cannot be diagnosed as a pedophile under DSM-IV. He also could cite no other definition of pedophilia that is generally accepted in the field of psychology or psychiatry. Yet, he still persisted in finding that Reese suffered from the mental abnormality of pedophilia. In short, Dr. Land testified that Reese should be diagnosed as a pedophile even though, based on the evidence in the probable cause record, he fails to fit the only generally accepted definition of pedophilia. This opinion is so incredible that no reasonable factfinder could accept it.
B. Does Reese Suffer from a Personality Disorder?
Under G.L.c. 123A, §1, a “personality disorder” is defined as “a congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses.” Dr. Land testified that Reese suffered from an Antisocial. Personality Disorder as defined in DSM-IV. One of the diagnostic criteria for Antisocial Personality Disorder in the DSM-IV — Criterion C — requires, “There is evidence of Conduct Disorder with onset before age 15 years.” DSM-IV-TR at 706. The diagnostic criteria for “Conduct Disorder” under DSM-IV requires “a repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated, as manifested by the presence of three (or more) of the following criteria in the past 12 months, with at least one criterion present in the past 6 months . . .” DSM-IV-TR at 98. The DSM-IV then lists 15 alternative criteria of misconduct under the categories of “aggression to people and animals,” “destruction of property,” “deceitfulness or theft,” and “serious violations of rules.” Id. at 98-99. There is no evidence in the probable cause record that Reese met any of these criteria before the age of 15; there is certainly no evidence that he met three of them, as required. Dr. Land bases his conclusion that the three criteria were met before age 15 on a single sentence in the social worker’s psychosocial assessment — "He was diagnosed as having a learning disability with some behavior problems in addition." This is plainly an inadequate basis to infer the onset of Conduct Disorder. Therefore, Dr. Land has opined that Reese suffers from Antisocial Personality Disorder despite the absence of any evidence that Reese satisfied a necessary diagnostic criterion of this disorder. This opinion, like his opinion regarding pedophilia, is so incredible that no reasonable factfinder could accept it.
Dr. Land’s opinion suffers from another blatant (and fatal) flaw. To find that Reese suffers from a “personality disorder” under G.L.c. 123A, §1 as a result of Antisocial Personality Disorder, Dr. Land must also find that this mental condition “results in a general lack of power to control sexual impulses.” There is nothing in DSM-IV that comes remotely close to declaring that Antisocial Personality Disorder “results in a general lack of power to control sexual impulses.” (Emphasis added.) Simply because a person suffers from a “mental disorder” as defined in DSM-IV does not automatically mean that the person suffers from a “personality disorder” as defined in G.L.c. 123A, §1. Indeed, the Introduction to DSM-IV-TR specifically warns:
*199 When the DSM-IV categories, criteria, and textual descriptions are employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a “mental disorder,” “mental disability,” “mental disease,” or “mental defect.”
DSM-IV-TR, Introduction at xxii-xxiii. Since the DSM-IV warns that a person suffering from a “mental disorder” under the DSM-IV may not suffer from a “mental disorder” as defined in law, one would presume that the warning would be even more forceful if the legal classification were a “personality disorder” whose definition specifically requires that the mental condition result “in a general lack of power to control sexual impulses.”
What then is the basis for Dr. Land’s opinion that Antisocial Personality Disorder “results in a general lack of power to control sexual impulses?” He admits that he has no empirical evidence to support this proposition. Rather, he testified that he learned this from clinical experience, because many of the sexual offenders he interviewed and many he read about suffered from Antisocial Personality Disorder. In effect, since in his clinical experience many sexual offenders suffer from Antisocial Personality Disorder, he concludes that most persons suffering from Antisocial Personality Disorder become sexual offenders. Logically, this is as ridiculous as believing that, since most rapists are male, most males are rapists. According to the DSM-IV, ”[t]he overall prevalence of Antisocial Personality Disorder in community samples is about 3% in males and 1% in females.” DSM-IV-TR at 704. The fact that some of these 3% become sexual offenders and that many sexual offenders have Antisocial Personality Disorder does not rationally permit the inference that most persons with Antisocial Personality Disorder become sexual offenders or even that sexual offenders with Antisocial Personality Disorder are likely to commit new sexual offenses.
Dr. Land’s conclusion that most persons suffering from Antisocial Personality Disorder become sexual offenders is also plainly refuted by the empirical evidence in the record. Dr. Land acknowledged that R. Karl Hanson is recognized as an authority regarding empirical studies of sexual recidivism. Three articles authored or co-authored by Hanson were offered into evidence as learned treatises:
Hanson, R. Karl, “What Do We Know About Sex Offender Risk Assessment,” Psychology, Public Policy and Law, 1998, Vol. 4, No. pp. 50-72;
R.K. Hanson & Bussiere, M.T., Predictors of Sexual Offender Recidivism: A Meta-Analysis (User Report No. 96-04) Ottawa, Ontario, Canada: Department of the Solicitor General of Canada (1996); and
R.K. Hanson & Thornton, David, Static 99: Improving Actuarial Risk Assessments for Sex Offenders (User Report No. 99-02.) Ottawa, Ontario, Canada: Department of the Solicitor General of Canada (1999).
These articles examine and summarize the findings from empirical studies in the research literature regarding the rate of recidivism of sexual offenders. Hanson has conducted a review of 61 studies providing information on a total of 29,972 sexual offenders, of which 9,603 were child molesters. R.K. Hanson & Bussiere, M.T., Predictors of Sexual Offender Recidivism: A Meta-Analysis at 13. Dr. Land, incredibly, has never read any article written by Hanson and knew nothing about his survey of the 61 studies. If he had, he would have learned that Antisocial Personality Disorder is only modestly correlated with sexual recidivism, with a correlation coefficient, referred to as the r value, of .14. Hanson, R. Karl, “What Do We Know About Sex Offender Risk Assessment," Psychology, Public Policy and Law, Table 1, at 57. Dr. Land conceded that, if most persons diagnosed with Antisocial Personality Disorder became sexual offenders, the r value would have been far higher.[5]
In conclusion, no reasonable factfinder, on this probable cause record, could find either that Reese suffers from an Antisocial Personality Disorder as defined in DSM-IV or, if he did, that Antisocial Personality Disorder “results in a general lack of power to control sexual impulses.” Since no reasonable factfinder, on this probable cause record, could therefore find, that Reese suffers from either a mental abnormality or a personality disorder, and since Reese as a matter of law must suffer from one of these conditions to be found a sexually dangerous person, there cannot be probable cause to believe that Reese is a sexually dangerous person.
Phrased differently, this Court finds that Dr. Land’s opinion that Reese suffers from both a mental abnormality and a personality disorder is not credible and, since the Commonwealth rests entirely on Dr. Land’s opinion for these required alternative elements, there is not enough credible evidence to withstand a directed verdict. Indeed, if the Daubert/Lanigan/Canavan standards were to apply to the testimony of such experts, Dr. Land’s opinion testimony would not even be admissible because it is not sufficiently reliable. Not only are his findings of pedophilia and Antisocial Personality Disorder, as defined by the diagnostic criteria set forth in DSM-IV, without factual basis in the record, but his personal experience and clinical observations are wholly inadequate to permit him to offer the opinion that Antisocial Personality Disorder “results in a general lack of power to control sexual impulses.” As the Supreme Court declared:
*200 There is no logical reason why conclusions based on personal observations or clinical experience should not be subject to the Lanigan analysis. “That a person qualifies as an expert does not endow his testimony with magic qualities.” Boston Gas Co. v. Assessors of Boston, 334 Mass. 549, 579 (1956). Observation informed by experience is but one scientific technique that is no less susceptible to Lanigan analysis than other types of scientific methodology. The gatekeeping function pursuant to Lanigan is the same regardless of the nature of the methodology used: to determine whether “the process or theory underlying a scientific expert’s opinion lacks reliability [such] that [the] opinion should not reach the trier of fact.” Commonwealth v. Lanigan, 419 Mass. 15, 26 (1994).
Canavan’s Case, 432 Mass. 304, 313 (2000). In this case, since the Court is the trier of fact in a probable cause hearing, it does not matter whether Dr. Land’s opinion is admitted and deemed unreliable, or stricken as unreliable. Either way, it cannot support a finding of probable cause.
C. Is Reese Likely to Engage in Sexual Offenses If Not Confined to a Secure Facility?
While a finding of no probable cause could rest on the insufficiency of evidence as to the second element, this Court will nonetheless address the third element needed to find someone a sexually dangerous person under G.L.c. 123A, §1 — that the person is likely to engage in sexual offenses if not confined to a secure facility. Pragmatically, if the evidence supported a high likelihood of sexual recidivism, this Court would revisit its finding regarding the absence of reliable evidence as to the second element.
Methods of Predicting Sexual Recidivism
There are at least three methods to predict whether a sexual offender is likely to engage in sexual offenses if not confined to a secure facility. The first is clinical judgment, “in which expert opinion is used to weigh a variety of information gained through interviews, formal testing, and offense history." R.K. Hanson & Büssiere, M.T., Predictors of Sexual Offender Recidivism: A Meta-Analysis, at 16. The second is statistical analysis, in which, through multiple regression analysis, one devises an algorithm that incorporates the variables most closely correlated with sexual recidivism to determine the statistical probability that a sexual offender with those pertinent characteristics will re-offend within a selected time frame (e.g. within five, ten, or fifteen years). Id. A third is guided clinical judgment, where the probability of sexual recidivism is determined by a combination of clinical judgment and statistical analysis, such that the clinical judgment is given a limited degree of weight along with the statistically predictive variables. Hanson, R. Karl, “What Do We Know About Sex Offender Risk Assessment,” Psychology, Public Policy and Law, at 61-62.
Clinical judgment is the predictive means anticipated by the Legislature when it enacted the 1999 legislation regarding sexually dangerous persons, because it provided that, after the probable cause hearing, the respondent must be examined and diagnosed by two qualified examiners. G.L.c. 123A, §13(a). The problem with clinical judgment is that, empirically, it has proven to have limited validity. “In general, the average predictive accuracy of professional judgment to predict sex offense recidivism is only slightly better than chance (average r=.10).” R.K. Hanson & Thornton, David, Static 99: Improving Actuarial Risk Assessments for Sex Offenders, at 2. Statistical risk prediction scales, developed from regression analysis and using multiple variables that have been shown to be correlated with sexual recidivism, have substantially greater predictive accuracy than clinical judgment. R.K. Hanson & Büssiere, M.T., Predictors of Sexual Offender Recidivism: A Meta-Analysis, at 16. It may be (although it has yet to be established) that guided clinical judgment can improve upon the predictive power of statistical risk prediction scales when there is specific information personal to the sexual offender that would affect the likelihood of recidivism but not show up as a variable measured in the algorithm, such as the offender’s professed willingness to re-offend. See Hanson, R. Karl, “What Do We Know About Sex Offender Risk Assessment,” Psychology, Public Policy and Law, at 61 (evaluators need to consider variables that have yet to receive full empirical validation, such as stated intention to re-offend). However, since statistics, in general, are better predictors of future sexual dangerousness than clinical judgments, caution needs to be used in adjusting a statistical prediction based on clinical judgment. See id. Pragmatically, this means that, while a factfinder may have good reason modestly to adjust a statistical probability based on idiosyncratic clinical information unique to the sexual offender, there would need to be a compelling reason to justify, a dramatic adjustment to the statistical probability.
Dr. Land’s Prediction of Sexual Recidivism
Dr. Land had not interviewed Reese, but that did not prevent him from offering what he characterized as a clinical judgment regarding Reese’s risk of sexual recidivism. He opined, based on his clinical experience and what he understood to be the research in the field, that it was more likely than not that Reese would commit a new sexual offense. He based this conclusion essentially on Reese’s sexual misconduct in July 1996, his alcohol and drug abuse, his purported Antisocial Personality Disorder, and his failure to receive Sex Offender Treatment at the House of Correction (even though he understood that no such treatment had been offered to him).[6] In effect, Dr. Land, since he never met the respondent, opined that a sex offender with those characteristics would more likely than not commit a new sexual offense.
*201 Realistically, there are only two sources of knowledge that would permit Dr. Land to render such an opinion regarding the likelihood of sexual recidivism: his own clinical experience with sex offenders and his knowledge of the empirical evidence. Dr. Land’s clinical experience does not provide this knowledge because he never conducted any follow-up of his patients. He may know the characteristics of the sexual offenders he treated, but this does not allow him to opine as to the likelihood of sexual recidivism because it does not and cannot take into account the number of sexual offenders with these characteristics who do not commit new sexual offenses. For instance, many sexual offenders may come from poor families, but this does not permit the inference that poverty necessarily makes a sexual offender likely to commit new sexual offenses.
Nor does Dr. Land have even a cursory understanding of the empirical evidence. As noted earlier, Dr. Land had never read any of the Hanson articles and knew nothing of Hanson’s empirical findings. He claimed, however, to have read summaries of research studies, including a chapter in Rosner’s Textbook of Forensic Psychiatry discussing such studies, although he could not specifically recall any of their findings.[7] He also said that he had listened to a lecture discussing sexual recidivism of sex offenders in 1996 while studying for his forensic psychiatry boards. This was the totality of his knowledge regarding the empirical evidence concerning sexual recidivism among sexual offenders. It is inconceivable that a psychiatrist could come to court and testify as an expert as to the probability that a sexual offender will commit a new sex offense without having even a rudimentary understanding of the empirical evidence regarding sexual recidivism.
Observations from the Empirical Evidence
In contrast with Dr. Land, this Court has carefully reviewed the empirical research in the record, including the three previously mentioned articles by Hanson and his colleagues, and the four articles offered into evidence by the Commonwealth, albeit under protest:[8]
R. Karl Hanson and Monique Bussiere, “Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies,” Journal of Consulting and Clinical Psychology, 1998, Vol. 66, No. 2, pp. 348-62.
Robert Prentky, Austin Lee, Raymond Knight, and David Cerce, “Recidivism Rates Among Child Molesters and Rapists: A Methodological Analysis,” Law and Human Behavior, Vol. 21, No. 6, 1997, pp. 635-58;
Robert Prentky, Austin Lee, and Raymond Knight, “Risk Factors Associated With Recidivism Among Extrafamilial Child Molesters,” Journal of Consulting and Clinical Psychology, 1997, Vol. 65, No. 1, pp. 141-49; and
Dennis Doran, “Recidivism Base Rates, Predictions of Sex Offender Recidivism, and the ‘Sexual Predator’ Commitment Laws,” Behavioral Sciences and the Law, Vol. 16, pp. 97-114.
In considering the empirical evidence, at least four observations emerge with clarity.
First, however one measures it, there is a significant risk that a sexual offender will commit a new sexual offense. The issue, then, in determining whether a person is sexually dangerous is not whether there is a risk of sexual recidivism, but whether that risk is so high that the sexual offender is deemed under the law to be “likely to engage in sexual offenses if not confined to a secure facility.”
Second, the magnitude of the risk of sexual recidivism depends on the length of time being measured. Not surprisingly, the probability that a sexual offender will commit a new sexual offense is higher if measured over the lifetime of the sexual offender than over the next five years. Based on a review of 61 studies providing information on a total of 29,972 sexual offenders, of which 9,603 were child molesters and 1,839 were rapists, the sex offense recidivism rate over the average four to five year follow-up period of these studies was 13.4 percent for all sexual offenders, 12.7 percent for child molesters, and 18.9 percent for rapists. R.K. Hanson & Bussiere, M.T., Predictors of Sexual Offender Recidivism: A Meta-Analysis, at 13. If one extends the follow-up period to 25 years, one study of 115 non-incestual child molesters found that 52 percent were charged with a new sexual offense. Dennis Doran, “Recidivism Base Rates, Predictions of Sex Offender Recidivism, and the ‘Sexual Predator’ Commitment Laws,” Behavioral Sciences and the Law, at 101. Another study of 191 child molesters, of which 18.3 percent were incest offenders, found that 35.1 percent were convicted of a new sexual offense during the 31-year follow-up period; one would expect this percentage to be greater, between 44.6 and 51.6 percent, if an arrest, rather than a conviction, were used as the measure of sexual recidivism. Id. at 101-03. In another long-term study of 265 male sexual offenders who had been committed to the Bridgewater Treatment Center, the failure rate among rapists (that is, the percentage of sexual offenders charged with at least one new sexual offense) was nine percent in the first year of release, with another two to three percent charged each year through the fifth year, and another one percent charged each year until the end of the 25-year follow-up period, for a cumulative failure rate of 39 percent. Robert Prentky, Austin Lee, Raymond Knight, and David Cerce, “Recidivism Rates Among Child Molesters and Rapists: A Methodological Analysis,” Law and Human Behavior, at 651-52. Among child molesters, the failure rate was six percent in the first year of release, another four percent for each of the next two years, and another two to three percent for each of the next two years, with a cumulative failure rate after 25 years of 52 percent. Id. at 652.
*202 Third, as noted above, the sexual recidivism rate will be lower if measured by the probability of a new conviction for a sexual offense rather than a new arrest for a sexual offense. Robert Prentky, Austin Lee, Raymond Knight, and David Cerce, “Recidivism Rates Among Child Molesters and Rapists: A Methodological Analysis,” Law and Human Behavior, at 645 (“The rate of recidivism using conviction or incarceration was one half that of the rate using charge during the first 5 years and slightly less than one-half thereafter”). Moreover, measures of either arrests or convictions inherently underestimate the actual rate of sexual recidivism because some share of sexual offenses, even those committed by convicted sexual offenders who may be supervised by a probation or parole officer, never come to official attention. Dennis Doran, “Recidivism Base Rates, Predictions of Sex Offender Recidivism, and the ‘Sexual Predator’ Commitment Laws,” Behavioral Sciences and the Law, at 99-100; R.K. Hanson & Bussiere, M.T., Predictors of Sexual Offender Recidivism: A Meta-Analysis, at 7.
Fourth, while the inherent limitations of the data allow empirical statistical analysis to provide only a rough estimate of the magnitude of the absolute or base risk of sexual recidivism, statistical analysis does permit us more accurately to assess sexual offenders’ relative risk of recidivism, that is, whether a sexual offender with certain characteristics poses a higher or lower risk of re-offending than sexual offenders with different characteristics. R.K. Hanson & Bussiere, M.T., Predictors of Sexual Offender Recidivism: A Meta-Analysis at 7.
Defining “Likely to Engage in Sexual Offenses If Not Confined to a Secure Facility”
In view of these considerations, it becomes essential to define what is meant by the third element of the definition of a sexually dangerous person under G.L.c. 123A, § 1 — that the person is “likely to engage in sexual offenses if not confined to a secure facility.” The Assistant District Attorney defines “likely” to mean that there are reasonable grounds to believe that the sexual offender will commit a new sexual offense over the lifetime of the offender: By that definition, in view of the empirical evidence, virtually all persons convicted of sexual offenses could be found to be sexually dangerous persons. Pragmatically, for at least three reasons, this cannot have been the intent of the Legislature when it enacted these provisions in 1999.
First, the consequence of being found a sexually dangerous person is that a person is deprived of his liberty for an indeterminate period of one day to life based, not on what the person has done in the past, but on what is feared he shall do in the future. See Commonwealth v. Bruno, 432 Mass. at 500-01. The magnitude of the feared harm must be substantial to justify so great a deprivation of liberty.
Second, the Legislature must have intended only a small percentage of persons convicted of sexual offenses to be found sexually dangerous. Under G.L.c. 123A, § 14(d), all persons found to be sexually dangerous after trial are committed to the Treatment Center for an indeterminate period of one day to life. In fiscal year 1999, 764 defendants were convicted of a sexual offense in Massachusetts, and 512 of them were incarcerated. Massachusetts Sentencing Commission, Survey of Sentencing Practices: FY 1999, Table 54. If even twenty percent of those incarcerated were to be deemed sexually dangerous and civilly committed each year, the Treatment Center, which has a capacity of roughly 200 sexual offenders, would soon be overwhelmed.
Third, all sexually dangerous persons must have a “mental abnormality” or a “personality disorder” as defined in G.L.c. 123A, §1, and the definition of these conditions requires not only a substantial likelihood of sexual recidivism but also a likelihood of imminent sexual recidivism. For one to suffer from a “mental abnormality,” one must have a condition “that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons.” G.L.c. 123A, §1. For one to have a “personality disorder,” one must have a condition “that results in a general lack of power to control sexual impulses.” G.L.c. 123A, §1. Reasonable grounds to believe that a sexual offender will commit a sexual offense before he dies is not consistent either with being so predisposed to sexual offenses as to be “a menace to the health and safety of other persons” or to having “a general lack of power to control sexual impulses.” If one indeed were so predisposed to commit a sexual offense as to be a menace to health and safety, or generally lacked power to control one’s sexual desires, one would expect that these predispositions would lead such a person to commit a new sexual offense within a few years of release, not simply in twenty or thirty years.
While it may be easy to reject the Assistant District Attorney’s definition of “likely to engage in sexual offenses if not confined to a secure facility,” it is less easy to formulate a more reasonable alternative. Looking to the dictionary does not help much, because the definitions of “likely” provide various orders of magnitude as to probability. Webster’s Dictionary defines “likely,” when used as an adjective, as "seeming as if it would happen or make.happen; reasonably to be expected; apparently destined; as, it is likely to happen any minute.” Used as an adverb, Webster’s defines “likely” to mean “probably.” Webster’s New Universal Unabridged Dictionary 2nd Ed. (1983). Nor is this Court aware of any legislative history that sheds light on the Legislature’s intent.
More useful guidance comes from the other, more established civil commitment statute — G.L.c. 123— which concerns the commitment and treatment of the mentally ill. In both G.L.c. 123 and c. 123A, the Legislature has balanced the governmental interest in *203 protecting society from future harm, whether from acts of violence or sexual misconduct, with the indeterminate deprivation of liberty that inevitably results. In order to justify an involuntary commitment, G.L.c. 123, §8(a), in pertinent part, requires a finding that “(1) such person is mentally ill, and (2) the discharge of such a person from a facility would create a likelihood of serious harm.” (Emphasis added). G.L.c. 123, § 1 defines “likelihood of serious harm” as:
(1) a substantial risk of physical harm to the person himself as manifested by evidence of threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person’s judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community.
See also Commonwealth v. Nassar, 380 Mass. 908, 912 (1980). It is noteworthy that “a likelihood of serious harm” under G.L.c. 123 requires both “a substantial risk” and specific evidence manifesting that risk, which dramatically limits the circumstances where a likelihood of serious harm can be found. It is also noteworthy that the Supreme Judicial Court in Nassar generally accepted the proposition that the State must support an involuntary commitment with a showing of imminent danger of harm so as to insure that the person’s “potential for doing harm, to himself and others, is great enough to justify such a massive curtailment of liberty.” Id. at 917, quoting Lessard v. Schmidt, 349 F.Sup. 1078, 1093 (E.D. Wis. 1972). “ ‘Immediacy’ is linked to the requirement of an enhanced standard of proof in the sense that the forecast of events tends to diminish in reliability as the events are projected ahead in time . . . We may accept, further, that in the degree that the anticipated physical harm is serious — approaches death — some lessening of a requirement of ‘imminence’ seems justified." Nassar at 917 (citations omitted). See also Commonwealth v. Rosenberg, 410 Mass. 347, 363 (1991) (noting that Commonwealth can prove the likelihood of serious harm without evidence of a recent overt act). In short, under G.L.c. 123, the deprivation of liberty inherent in an involuntary commitment must be justified by 1) a substantial risk of physical harm, 2) manifested by specific evidence, and 3) the risk of harm must be imminent, unless the anticipated harm is so serious as to approach death.
The absence of any requirement in G.L.c. 123A that there be specific evidence manifesting the risk of sexual harm, combined with the broad scope of sexual offenses in G.L.c. 123A, §1 (which range from rape to unnatural and lascivious acts with a child under 16), pose a substantial threat that liberty will be too easily deprived unless “likely to engage in sexual offenses” is rigorously defined. While courts must be mindful that the purpose of c. 123A is to protect the public from sexually violent predators,- they must also be cautious to guard against casting too wide a net in their determination of who is and is not a sexually dangerous person. Commonwealth v. Toland, 11 Mass. L. Rptr. 685, 2000 WL 576341, *8-9 (Mass. Super. 2000). Such caution is part of what we admire about this Commonwealth, which has been one of the innovators in identifying the risks to individual liberty and dignity in the civil commitment process. McCabe v. City of Lynn, 875 F.Sup. 53, 61 (D.Mass. 1995).
For all practical purposes, by defining “likely to engage in sexual offenses,” we determine what likelihood of harm justifies a civil commitment. See Cross v. Harris, 418 F.2d 1095, 1100-01 (D.C. Cir. 1969). Given the ambiguity of the word “likely," if this term is not better defined as a matter of law, every factfinder, whether judge or juiy, will effectively be able to determine what “likely” means to them, and thereby be able to determine what risk of harm justifies a civil commitment. While some degree of discretion is necessary for any factfinder making such a decision, it is troubling that some persons reasonably may define “likely” to mean a substantial risk, while others may define it as more likely than not, and still others will define it as highly probable.
This Court defines “likely to engage in sexual offenses” to mean that there is a substantial likelihood, at least more likely than not, that the respondent will commit a new sexual offense within the immediate future, understood generally to be within the next five years but with a longer time horizon if the anticipated future harm is extremely serious. This definition provides a floor (more likely than not) below which a person may not be civilly committed for fear of future sexual dangerousness, but also leaves the factfinder some flexibility to consider the probability of harm, the severity of harm, and the imminence of harm in determining sexual dangerousness. This definition also permits the research data regarding the rate of sexual recidivism to be meaningfully applied to specific cases, since the parameters of the definition conform to the parameters of many research studies. It also ensures, in view of the empirical data, that only the highest risk sexual offenders will find themselves facing sexually dangerous person petitions, because the empirical data reflects that only a small share of sexual offenders have this high a risk of sexual recidivism. For instance, based on Hanson’s actuarial analysis, which he incorporated into the Static-99 scale, the 12 percent of sexual offenders with the highest risk had a sexual recidivism rate over a five-year period of 39 percent. R.K. Hanson & Thornton, David, Static 99: Improving Actuarial Risk Assessments for Sex Offend *204 ers, at 12. A subset of these highest risk offenders would then comprise the class of sexually dangerous persons. Limiting the class of sexually dangerous persons to the highest risk offenders provides another practical advantage; it permits the factfinder to rely more heavily on the respondent’s relative risk of sexual recidivism, which statistically is more reliable than the absolute risk of sexual recidivism because of the uncertainty as to the percentage of unreported crimes.
In establishing a more precise definition of “likely to engage in sexual offenses” than is found in the statute, this Court has done nothing more than what the Supreme Judicial Court itself did in Bruno when it established a more precise definition of two other terms found in the statute — the “sufficient showing based on the evidence” needed to justify temporary commitment and “probable cause” to believe that the respondent is a sexually dangerous person. G.L.c. 123A, §§12(e) and 12(c). There, as noted earlier, the Supreme Judicial Court defined “sufficient showing based on the evidence” to mean “probable cause,” and “probable cause” to mean the “directed verdict stan-. dard.” Commonwealth v. Bruno, 432 Mass. at 507-11. The Supreme Judicial Court provided a more precise definition of these terms for the same reason that this Court does today — to ensure a definition that conforms to the legislative purpose, the requirements of due process, and the need for a clearer, more admin - istrable standard. See id.
Applying the Empirical Evidence
With this more precise definition of “likely to engage in sexual offenses if not confined to a secure facility,” it becomes clear that, based on the empirical evidence, there is a significant statistical risk that Reese will commit a new sexual offense but that risk is not so great that it reasonably permits a finding that he is “likely to engage in sexual offenses if not confined to a secure facility.”
There is no empirical evidence in the record to support the inference that Reese’s failure to obtain sex offender treatment at a House of Correction which, according to Dr. Land, did not offer such treatment, is correlated with a greater risk of recidivism. It is true that, among those offenders who began treatment, those “who were unmotivated to attend treatment, or who failed to complete treatment, were at greater risk for general recidivism than those who completed treatment (r=.14).” R.K. Hanson & Bussiere, M.T., Predictors of Sexual Offender Recidivism: A Meta-Analysis at 16. But there is no evidence in the probable cause record to support the opinion that the failure to obtain treatment that was not offered is correlated with sexual recidivism.[9] Moreover, it should be noted that Reese, while on probation, is required to obtain sex offender counseling, so any failure to remain in counseling will likely result in his return to jail.
There is support in the empirical literature for the conclusion that, in general, child molesters who have an alcohol abuse history, have never been married, have a history of criminality, and have had sex with children of the same gender are at a higher risk to re-offend. See Robert Prentky, Austin Lee, and Raymond Knight, “Risk Factors Associated With Recidivism Among Extrafamilial Child Molesters,” Journal of Consulting and Clinical Psychology, at 142; R.K. Hanson & Bussiere, M.T., Predictors of Sexual Offender Recidivism: A Meta-Analysis; R.K. Hanson & Thornton, David, Static 99: Improving Actuarial Risk Assessments for Sex Offenders. However, there is no support, either in the empirical literature offered by the Commonwealth or by the respondent, for the conclusion that these factors make the respondent more likely than not to commit a new sexual offense within the next five years. Indeed, if one applies Hanson’s Static 99 test to Reese, it emerges that, out of six risk categories, with the sixth being the highest, he falls into the fourth category — 21 percent of sexual offenders fall into a higher category, 18 percent fall into his category, and 62 percent fall into a lower risk category. According to the Static-99 test, the sexual recidivism rate for this fourth category over a five-year period is 26 percent. See R.K. Hanson & Thornton, David, Static 99: Improving Actuarial Risk Assessments for Sex Offenders; Amy Phenix, R. Karl Hanson, and David Thornton, Coding Rules for the Static-99. It would be naive to call this risk insignificant, but it cannot as a matter of law be deemed a level that justifies an indefinite civil commitment.
The Commonwealth’s Motion to Strike the Learned Treatise Articles That Were Admitted Into Evidence
The District Attorney has moved to strike all the learned treatise articles, arguing that the analysis of the empirical data regarding actual rates of sexual recidivism should not be considered by the Court. The District Attorney essentially takes the position that no Court at a probable cause hearing should consider the empirical research measuring the actual rates of sexual recidivism and the factors that are correlated with sexual recidivism. This position is contrary to law, contrary to good sense, and contrary to any intellectually honest evaluation of sexual recidivism. As a result, the District Attorney’s motion to strike the learned treatises is denied.
In considering this motion, it is important to provide its context. On March 20, 2001, just six days before Dr. Land’s testimony at this probable cause hearing, this Court completed a probable cause hearing in another case in which the Plymouth Counfy District Attorney sought civilly to commit a respondent as a sexually dangerous person. Commonwealth v. Wilson Rodriguez, Plymouth Civ. No. 00-0122-A. At that hearing, defense counsel offered the three Hanson articles into evidence, without objection from the Plymouth County' District Attorney. This Court carefully reviewed these learned treatises and incorporated its *205 findings in a detailed decision on probable cause. Memorandum and Order on Probable Cause, Commonwealth v. Wilson Rodriguez, Plymouth Civ. No. 00-0122-A (March 27, 2001) [13 Mass. L. Rptr. 27). When Dr. Land testified in the instant case, this Court, as a result of having reviewed the exhibits in the Rodriguez case, was already familiar with this empirical research. The Court asked defense counsel in the instant case whether he wished to offer these research articles into evidence, and he replied that he did wish them admitted as exhibits. This time, however, the Assistant District Attorney objected to their admission.[10] The Court overruled the objection but, at the close of the evidence on March 26, continued the probable cause hearing until March 28 to give the Assistant District Attorney adequate time to offer other research articles that refute or challenge either the methodology or the findings in the Hanson articles. On March 28, the Assistant District Attorney moved to strike these articles and, in the event that the Court denied her motion to strike, sought to admit as exhibits the four other research articles previously described
The Legislature, when it enacted the 1999 law regarding sexually dangerous persons, recognized that the unusual nature of the fact-finding — the prediction of future sexual dangerousness — justified adaptations from the usual rules of evidence. For instance, “police reports relating to such person’s prior sexual offenses,” even though they often contain hearsay or double hearsay that would render such documents inadmissible, are admissible not only at a probable cause hearing but also at trial. G.L.c. 123A, §14(c). The same provision which permits police reports, prison incident reports, victim statements, and other documents that may not be admissible at trial under the traditional rules of evidence to be admitted at a trial on the issue of sexual dangerousness also expressly permits into evidence “any other evidence tending to show that such person is or is not a sexually dangerous person,” provided the written information has been provided to opposing counsel. Id. These research articles, which would be deemed learned treatises under G.L.c. 233, §79C if this were a medical malpractice case, are precisely the type of evidence that must be considered if a factfinder is to have an accurate understanding of sexual recidivism. The District Attorney would prefer that the Court be limited to so-called expert testimony that makes imprecise, vague, and, here, inaccurate references to the research data, and would bar the Court from scrutinizing the expert’s opinion by reference to the research data itself. That is the philosophy of the ostrich and is incompatible with the truth-seeking function of this Court, especially on an issue such as this so crucial both to the liberty of the respondent and the safety of the community.
Nor is there anything unfair about the admission of these learned treatises. Here, while the circumstances of the probable cause hearing did not permit the Assistant District Attorney to have prior notice of these articles (although her Office had prior notice of them), this Court remedied that potential unfairness by continuing the hearing for two days to permit the District Attorney to challenge or refute the empirical data. In fact, the four research articles subsequently furnished by the District Attorney do not challenge or refute the empirical data contained in the three Hanson articles; one is simply another article by Hanson summarizing the findings of his “Meta-Analysis” of the 61 research studies on sexual recidivism that he surveyed, and the other three provide additional insights that simply enhance the Court’s understanding of the subject of sexual recidivism.
Nor is it true, as the District Attorney contends, that the admission of these empirical studies shifts the focus of the probable cause hearing away from the respondent. This Court fully understands that the issue before the Court is the likelihood that Christopher Reese will commit a new sexual offense. That does not mean, however, that the Court, as probable cause factfinder, should ignore the empirical data that describes whether persons who share certain characteristics with Mr. Reese have or have not historically committed new sexual offenses. The District Attorney would be better advised to consider this empirical data rather than attempt to bury it.
ORDER
For the reasons detailed above, this Court finds that there is not probable cause to believe that Reese is a sexually dangerous person as defined in G.L.c. 123A, § 1. Since Reese has completed his term of imprisonment and is being held in custody only as a result of this petition, this Court ORDERS that Reese be released from custody forthwith and commence his term of probation.

 This last document was prepared on behalf of the defendant at the time of his criminal sentencing on the sexual offense conviction.

 It is not clear from the record what conduct formed the basis for this charge.

 The Commonwealth correctly recognizes that the other two definitions of sexually dangerous persons identified in G.L.c. 123A, §1 do not apply to Reese — he was never determined to be incompetent to stand trial so subsection (ii) cannot apply and he was never previously adjudicated a sexually dangerous person so subsection (Hi) cannot apply.

 It should be noted that on March 15, 2001, in the case of Commonwealth v. Wilson Rodriguez, Dr. Land testified that pedophilia was a personality disorder and not a mental abnormality.

 The r value is a correlation coefficient that measures the strength of correlation between one variable, such as antisocial personality, with another variable, such as sexual recidivism. “Correlation coefficients can range from -1 to +1, with 0 indicating no predictive accuracy and values farther from 0 indicating greater predictive accuracy . . . The translation between correlation coefficients and expected recidivism rates *206 is only approximate and is influenced by recidivism base rates.” Hanson, R. Karl, “What Do We Know About Sex Offender Risk Assessment," Psychology, Public Policy and Law, 1998, Vol. 4, No. 1/2 at 53-54. In examining the recidivism rates for sexual offenders, a correlation of 0 means that adding this variable to the mix provides no greater predictive accuracy than a random variable; a correlation of 1 would reflect perfect correlation. Statistically speaking, “[sjince the recidivism outcome criteria was dichotomous, r translated into point-biserial correlation coefficients for linear predictors (e.g., age) and the phi coefficient for dichotomous predictors (e.g., married or not).” R.K. Hanson & Bussiere, M.T., Predictors of Sexual Offender Recidivism: A Meta-Analysis, at 11.

 Reese's attorney provided the Court with a letter dated March 14, 2001 from James Weeden claiming that Reese had been enrolled since September 2000 in the Educational Sex Offenders Group at the Plymouth County House of Correction. Since this letter was not authenticated, the Court acknowledges its receipt but gives it minimal weight.

 It should be noted that this Court directed the Commonwealth to produce to the Court a copy of this textbook so that the Court could determine for itself whether this textbook indeed contains any discussion of the empirical research regarding sexual recidivism. One would think that the District Attorney would be eager to comply with this Order in order to bolster the testimony of its sole expert. Instead, the District Attorney has filed an appeal of this Order, thereby depriving the Court of the textbook and depriving itself of the opportunity to corroborate Dr. Land's feeble claim of expertise on the subject of sexual recidivism.

 The District Attorney has moved to strike all the empirical evidence contained in these learned treatises. For the reasons discussed later in this Memorandum, that motion to strike is denied.

 General recidivism is the rate of commission of new offenses, not just sexual offenses; sexual recidivism is focused only on the rate of commission of new sexual offenses, which is the only relevant issue in determining whether a person is a sexually dangerous person.

 A different Assistant District Attorney was responsible for the probable cause hearing in the Rodriguez case.