Gants, J.
On March 14, 2003, after three weeks of trial, the juiy returned its verdict finding that the respondent Alden Baker (“Baker”) was not a sexually dangerous person (“SDP”) as defined in G.L.c. 123A, §1. While this Court addressed a host of difficult legal issues during the course of that trial, there were two issues that merit the preparation of a post-trial memorandum of law because of the strong likelihood that these issues will emerge again in future SDP trials.
1. The Definition of a Reasonable Degree of Professional Certainty
At trial, the Commonwealth called only two witnesses, Qualified Examiners Niklos Tomich and Stephen DeLisi. Both offered opinions “to a reasonable degree of professional certainly” that Baker suffered from a mental abnormality or personality disorder, and that he was likely to engage in sexual offenses if not confined to a secure facility. Before they testified, this Court conducted a voir dire to learn how they defined the term “to a reasonable degree of professional certainty” and allowed inquiry at trial as to how they defined this term. Both testified, in essence, that “a reasonable degree of professional certainty” was the degree of certainty that they relied upon in their professional life in making clinical judgments. Neither explained what level of certainty they required before they made clinical judgments, or whether this level of certainty was the same as to all patients and all clinical contexts. Dr. DeLisi also offered an alternative, quite different definition — the degree of certainty sufficient to allow members of the profession to reach the same conclusion. Dr. DeLisi emphasized that this was not the level of certainty that necessarily meant that members of the profession “would” reach the same conclusion; it was simply that quantum of certainty needed so that members of the profession “could” reach the same conclusion.[1]
Both Drs. Tomich and DeLisi admitted that “a reasonable degree of professional certainty” did not mean “beyond a reasonable doubt.”[2] Indeed, both testified that they could not opine beyond a reasonable doubt that Baker either suffered from a mental abnormality or personality disorder, or that he was likely to engage in sexual offenses if not confined to a secure facility.
The Commonwealth vigorously objected to this Court allowing inquiry as to whether the opinions the qualified examiners had “to a reasonable degree of professional certainty” meant that they held these opinions “beyond a reasonable doubt,” contending that it “usurped” the role of the jury. This Court ruled that this inquiry did not in any way “usurp” the role of the juiy but rather protected the jury from the misunderstanding and confusion that can lead to a miscarriage of justice. While the Court explained the basis for this ruling on the record at trial, it is useful to articulate it again in writing.
When a medical expert offers an opinion in a medical malpractice case that the defendant doctor, “to a reasonable degree of medical certainty,” breached the standard of care of the average doctor in his speciality, the juiy reasonably understands that the expert holds his opinion, at least, by a preponderance of the evidence. As a result, the juiy reasonably understands that the medical expert, based on what he knows about medicine and has learned from the records he has reviewed, has found by a preponderance of the evidence that the defendant doctor breached the standard of care. Consequently, the plaintiffs attorney does not invite confusion or misunderstanding when he argues to the juiy that they should find the defendant doctor negligent based on the opinion of that medical expert. Nor does anyone conclude that the role of the juiy has been “usurped” by being allowed to hear such an opinion.
In an SDP case, however, the burden on the Commonwealth is not a fair preponderance of the evidence, but proof beyond a reasonable doubt. When a psychologist offers an opinion that a respondent is an SDP “to a reasonable degree of professional certainty” and does *102 not carefully define this term, the jury reasonably will understand that the expert holds his opinion to a degree of certainty that would permit the jury, if it were to find him credible and rely on his testimony, to conclude that the respondent is an SDP. The jury will come to this understanding based both on context and language. The context is that the Assistant District Attorney has essentially told them in his opening statement (and will again tell them in his closing argument) that the qualified examiners have concluded that the respondent is an SDP and that they should be persuaded by these expert opinions to reach the same conclusion. As to language, the phrase the expert will use to describe the strength of his opinion is a “reasonable degree of professional certainty.” The jury will be told by the Court, as part of its Webster instruction, that proof beyond a reasonable doubt means that the evidence must convince them that the respondent is a sexually dangerous person “to a reasonable and moral certainty; a certainty that convinces your understanding and satisfies your reason and judgment as jurors who are sworn to act conscientiously on the evidence.” Unless a linguist is among the jurors, the jury is not likely to recognize that a “reasonable degree of professional certainty” may constitute a far lower degree of certainty than “a reasonable and moral certainly.”
Indeed, if the qualified examiners’ understanding of the term — "a reasonable degree of professional certainty" — were not explored in the testimony, the jury almost certainly would have assumed that the qualified examiners, based on the information they had reviewed, had found the respondent to be sexually dangerous beyond a reasonable doubt. Here, that assumption would have been wrong. The fact of the matter is that both the qualified examiners, had they been jurors and required to determine sexual dangerousness based solely on the information known to them, would have been required to find that Baker was not an SDP, because both could not conclude that he was sexually dangerous beyond a reasonable doubt. In other words, both the experts the Commonwealth put on the stand to convince the jury that it should find Baker to be an SDP beyond a reasonable doubt did not find Baker to be an SDP beyond a reasonable doubt.[3]
Justice demands that a jury be permitted to understand what an expert means when he offers an opinion “to a reasonable degree of professional certainty,” and not be left to assume its meaning, especially when the jury’s assumption is likely to be erroneous. This does not “usurp” the jury’s role as factfinder. By hearing this testimony, a jury in an SDP case, like a jury in a medical malpractice case, is not delegating to the expert its responsibility to render a verdict. Rather, allowing this testimony respects the jury’s need to find the truth, and not be misled or confused by the jargon used in the trial.
Indeed, allowing this testimony amounts to little more than allowing inquiry into the expert’s definition of a term of art the expert has used in his testimony. When an expert answers, “yes” to the question, “Do you have an opinion to a reasonable degree of professional certainty?,” the expert is adopting the use of that term — a reasonable degree of professional certainty — as his own. It is certainly permissible to ask the expert what he understands that term to mean. It is equally permissible to probe the contours of that term: Does the expert understand “a reasonable degree of professional certainty” to mean more likely than not? Does the expert understand it to mean beyond a reasonable doubt? If the answer to the latter question is “yes,” then the juiy in an SDP case understands that the expert holds his opinion with the same degree of certainty the juiy must have to find the respondent an SDP. If the answer is “no,” it is appropriate to seek to clarify the expert’s use of this term and determine precisely the level of certainty with which the expert holds his opinion. The juiy’s understanding of the weight and meaning of the expert’s testimony is enhanced by this inquiiy, not usurped by it.
2. The Need to Determine Whether Likelihood to Commit Further Sexual Offenses Means Likely in the Respondent’s Lifetime or Likely in the Immediate Future
Under G.L.c. 123A, §1, a “sexually dangerous person" is defined as a person who has been convicted of a sexual offense and who “suffers from a mental abnormality or personality disorder which makes such person likely to engage in sexual offenses if not confined to a secure facility.” G.L.c. 123A, §1. Therefore, for a juiy to find a respondent to be an SDP, the Commonwealth needs to prove three elements beyond a reasonable doubt:
(1) that the respondent has been convicted of a “sexual offense,” as that term is defined under the law;
(2) that he suffers from a mental abnormality or personality disorder; and
(3) that that mental abnormality or personality disorder makes him likely to engage in further sexual offenses if not confined to a secure facility.
As to the third element, the Supreme Judicial Court in Commonwealth v. Boucher recently defined “likely” for purposes of determining whether a respondent is an SDP to mean “it is reasonably to be expected in the context of the particular facts and circumstances at hand.” 438 Mass. 274, 276 (2002). The Supreme Judicial Court refused to give the temí “likely” a quantifiable statistical probability, declaring that its definition “demands contextual, not statistical, analysis , ” but it did state that it requires “more than a mere propensity or possibility.” Id. at 277. The amorphous definition of “likely” declared in Boucher essentially leaves it to the juiy to assess the risk that the respon *103 dent will commit a new sexual offense and determine whether that risk reaches or fails to reach the level of “likely” in the context of the particular case. In determining whether the risk reaches or fails to reach the level of “likely,” the jury may consider “the seriousness of the threatened harm, the relative certainty of the anticipated harm, and the possibility of successful intervention to prevent that harm.” Id. at 276.
What the Court in Boucher did not address, however, is the length of time that the juiy should consider in determining whether the respondent’s mental abnormality or personality disorder makes him likely to engage in further sexual offenses if not confined to a secure facility. Stated more bluntly, the juiy needs to Itnow whether it is determining whether the respondent’s mental abnormality or personality disorder makes him likely in his lifetime to engage in further sexual offenses if not confined to a secure facility or whether it is determining whether the respondent’s mental abnormality or personality disorder makes him likely in some period of time less than his lifetime to engage in further sexual offenses if not confined to a secure facility.[4] This distinction could potentially have been critical in the Baker trial, because both Drs. Tomich and DeLisi opined that Baker was likely to engage in further sexual offenses if not confined to a secure facility during his lifetime, but both also opined that Baker was not likely to commit further sexual offenses while he was under probation supervision, which he would be for five years after his release.[5] In view of this testimony, there was no expert opinion that Baker was likely to commit further sexual offenses in the first five years of his release. As a result, the juiy certainly could have concluded that Baker was likely in his lifetime to commit further sexual offenses if not confined to a secure facility, but was not likely to do so within the first five years (or some other period of time less than his lifetime).
Since the law was not clear as to this issue, this Court asked the juiy to make findings regarding two alternative formulations of the law. The first formulation, urged by the Commonwealth, asked the juiy to determine whether Baker’s mental abnormality or personality disorder made him likely in his lifetime to engage in further sexual offenses if not confined to a secure facility. If its answer to this first question were “no,” meaning that he was not likely in his lifetime to engage in further sexual offenses if not confined in a secure facility, then the juiy would not need to reach the second question, which asked whether Baker’s mental abnormality or personality disorder made him likely in the immediate future to engage in further sexual offenses if not confined to a secure facility. The Baker juiy answered the first question “no," and therefore effectively mooted the legal issue as to which formulation is correct. Since other judges may not be able to avoid deciding this question as a result of the juiy’s verdict, this Court believes it appropriate to explain why it offered the alternative formulation— whether Baker’s mental abnormality or personality disorder made him likely in the immediate future to engage in further sexual offenses if not confined to a secure facility — and how it defined that alternative formulation.
This legal formulation derived from the Supreme Judicial Court’s decision in Commonwealth v. Nassar, which determined that a judge in an involuntaiy commitment proceeding under G.L.c. 123, §8(a) considering whether the discharge of a mentally ill person from a secure facility “would create a likelihood of serious harm” must actually determine whether discharge would create a likelihood of serious harm in the immediate future. 380 Mass. 908, 916-17 (1980). In Nassar, the Supreme Judicial Court adopted the proposition articulated in Lessard v. Schmidt, 349 F.Sup. 1078 (E.D. Wis. 1972) (three-judge court), vacated and remanded on other grounds, 414 U.S. 473 (1974), that “involuntary commitment must be supported by a showing by the State of imminent danger of harm; this to assure that the individual’s ‘potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty.’ ” Nassar, 380 Mass. at 916-17, quoting Lessard, 349 F.Sup. at 1093, which quotes Humphrey v. Cady, 405 U.S. 504, 509 (1972).[6] The Supreme Judicial Court noted:
“Immediacy” is linked to the requirement of an enhanced standard of proof in the sense that the forecast of events tends to diminish in reliability as the events are projected in time ... We may accept, further, that in the degree that the anticipated physical harm is serious — approaches death— some lessening of a requirement of “imminence” seems justified.
Nassar, 380 Mass. at 917.
In requiring that the likelihood of serious harm also be “imminent,” the Supreme Judicial Court added a requirement to the statutory language of G.L.c. 123, §1, which did not define the “likelihood of serious harm” to include imminent harm.[7] As noted above, the Supreme Judicial Court added this requirement because it was linked to the standard of proof beyond a reasonable doubt (since events in the more distant future can less reliably be predicted), and to the danger of harm that is needed to justify the involuntary confinement of a person. Nassar, 380 Mass. at 916-17. See also Acting Superintendent of Bournewood Hospital v. Baker, 431 Mass. at 105.
Since the reasonable doubt requirement and the curtailment of liberty are the same in an SDP proceeding under G.L.c. 123A as in an involuntary civil commitment proceeding under G.L.c. 123, there is no reason why a showing of imminent harm should be required in the latter proceedings but not in the former. Indeed, an SDP proceeding is essentially a type of involuntary civil commitment where the substantial *104 risk of physical harm to others is a sexual assault, and the requirement that the respondent be mentally ill is replaced by the requirement that the respondent have a mental abnormality or personality disorder that makes him likely to engage in sexual offenses.
Nor, for two reasons, can the imminent harm requirement fairly be criticized as adding an element to the statutory requirements for finding a respondent an SDP. First, the imminent harm requirement does not truly add an element; it simply defines an existing element — that the respondent be likely to engage in sexual offenses in not confined to a secure facility. As is apparent from the evidence in the Baker case, no factfinder can make a determination regarding this element without knowing what period of time in which to evaluate the likelihood. Since the statute begs the question, the period of time — whether it be the respondent’s lifetime, or the immediate future, or some other formulation — must be layered onto the definition of likelihood. If the court does not define the period of time for the jury, the jury will have to define it for itself, because no finding as to likelihood is possible without knowing the period of time in which to assess the likelihood. Second, even if an imminent harm requirement were seen as an addition to the statutory requirement of likelihood in G.L.c. 123A, adding this requirement is doing nothing more than what the Supreme Judicial Court itself did in Nassar under G.L.c. 123. In defining the term “in the immediate future," the Court attempted to give the jury the same leeway and encourage the same contextual analysis with this term as the Supreme Judicial Court did in Boucher with the term “likely.” The Court told the jury:
In considering this alternative question, the term “in the immediate future,” as with the term “likely,” does not have a precise quantifiable meaning in terms of a fixed number of months or years. You must determine, in the context of the particular facts and circumstances in this case, the length of time that constitutes “in the immediate future.” That length of time is certainly longer than days or weeks, and may consist of months or years. The greater the degree of threatened harm, the longer may be the period of time that constitutes “the immediate future.” Much as the law gives you, the juiy, some discretion in determining the degree of likelihood that you find to be necessary to permit a respondent to be deprived of his liberty because of the risk of future sexual offenses, so, too, are you given some discretion in determining the length of time in the future that you should consider in evaluating that risk. In short, you must determine how immediate the risk of sexual offenses must be to justify the involuntary commitment of an individual.
While the jury’s finding that Baker was not likely in his lifetime to commit further sexual offenses obviated the need for this Court to choose which formulation legally is correct, other judges will not be so fortunate. The fact of the matter is that no jury reasonably can be asked to determine whether the respondent in an SDP case is likely to commit further sexual offenses unless the juiy is also given guidance as to the period of time in which to evaluate that likelihood. As could have happened in this case in view of the opinions proffered by the Qualified Examiners, the juiy’s verdict may depend on whether the period of time is the respondent’s lifetime or, as required in Nassar for G.L.c. 123 commitments, the immediate future. Not only will the period of time chosen affect whether some respondents are found sexually dangerous, but the choice also, as recognized in Nassar, will reflect how great the potential of harm must be “to justify such a massive curtailment of liberty.” Nassar, 380 Mass. at 917, quoting Lessard, 349 F.Sup. at 1093, which quotes Humphrey v. Cady, 405 U.S. at 509. Put bluntly, as a matter of constitutional law and statutoiy interpretation, the question that must be asked and resolved is: Will Massachusetts courts permit an individual to be held in civil custody who is not likely to commit a sexual offense in the immediate future but is likely to commit such an offense at some later point in his lifetime? This Court fervently hopes that this memorandum will cause other Superior Courts, and ultimately the Supreme Judicial Court, to address that question.

 It is important to note, that a voir dire was conducted of all the experts who offered an opinion as to whether Baker was an SDP, not just the Commonwealth’s experts, regarding their understanding of the meaning of “a reasonable degree of professional certainty. ” Their definitions of this term varied considerably from each other and from the definitions proffered by Drs. Tomich and DeLisi:
Dr. Daniel Kriegman testified that he interpreted the term in light of the code of ethics of psychology, which he understood to require a psychologist to state what is most likely to be true and then define the limits of that statement within the context of the case. Stated more concretely, Dr. Kriegman understood that the term meant his “best diagnosis” and that, having given his “best diagnosis,” he was obligated also to state the margin of error of that diagnosis.
Dr. Leonard Bard testified that he understood a reasonable degree of professional certainty to mean that, based on the research and literature, the opinion was consistent with what psychologists know. He said it meant “at least” that his opinion was more likely tme than not true.
Dr. Fred Berlin said he understood a reasonable degree of professional certainty to mean that he based his opinion on “clear and convincing evidence.”

 The Court read to both experts the instruction that the Court provided to the jury, both in its preliminary and final instructions, regarding the definition of proof beyond a reasonable doubt. That instruction, derived from the traditional Webster instruction routinely used in criminal cases, is reprinted below:
The burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant is a “sexually dangerous person,” as that term is defined under the law, that is, a person who has been convicted of a sexual offense and who suffers from a mental abnormality or personality disorder that makes that person likely to engage in sexual *105 offenses if not confined to a secure facility. What is proof beyond a reasonable doubt? The term is often used and probably pretty well understood, though it is not easily defined. Proof beyond a reasonable doubt does not mean proof beyond all possible doubt, for everything in the lives of human beings is open to some possible or imaginary doubt. A charge is proved beyond a reasonable doubt if, after you have compared and considered all of the evidence, you have in your minds an abiding conviction, to a moral certainty, that the Commonwealth has met its burden of proving that Mr. Baker is a sexually dangerous person. I have told you that every person is presumed not to be a sexually dangerous person unless and until he is proven to be a sexually dangerous person, and that the burden of proof is on the Commonwealth. If you evaluate all the evidence and you still have a reasonable doubt remaining, Mr. Baker is entitled to the benefit of that doubt and must be found not to be a sexually dangerous person. It is not enough for the Commonwealth to establish a probability, even a strong probability, that Mr. Baker is a sexually dangerous person. That is not enough. Instead, the evidence must convince you that Mr. Baker is a sexually dangerous person to a reasonable and moral certainty; a certainty that convinces your understanding and satisfies your reason and judgment as jurors who are sworn to act conscientiously on the evidence. That is what we mean by proof beyond a reasonable doubt.
See Commonwealth v. Webster, 5 Cush. 295, 320 (1850).

 This would be the equivalent of the plaintiffs expert in a medical malpractice suit testifying that, to a reasonable degree of medical certainty, the defendant doctor breached the applicable standard of care even though the expert had concluded that it was more likely than not that the defendant doctor was not negligent.

 The importance of knowing the period of time over which to measure likelihood is not unique to the SDP context. If one were to ask an astronomer whether it is likely that a meteor of considerable size will strike the Earth, the answer may depend on whether the period of time in question is our lifetime or the lifetime of the Earth. The distinction is hardly insignificant to those of us presently living on this planet.

 Upon his release from civil commitment, Baker would commence a five-year “on and after” state probation period as a result of the suspended sentence he received on one of the two rape counts, and a three-year period of federal supervised release on his federal conviction for the sexual exploitation of children. Therefore, for the first three years following his release, he would be supervised by both a federal and a state probation officer.

 This Court recognizes that the Supreme Judicial Court in Nassar did not use clear language expressly adopting the Lessard formulation, noting instead that it had been cited by the respondents for this proposition. Nassar, 380 Mass. at 916-17. However, as one reads the balance of the Supreme Judicial Court’s discussion about Lessard, much of which is quoted above, it is clear that the Supreme Judicial Court in Aassar indeed adopted this formulation. Id. at 917. Any doubt on this issue is eliminated by the Supreme Judicial Court’s more recent decision in Acting Superintendent of Bournewood Hospital v. Baker, where the Court expressly adopted this formulation, declaring:
When hospitalization becomes an involuntary matter at the initiative of government, the result is “a massive curtailment of liberty” which requires a showing of “imminent danger of harm.” Commonwealth v. Nassar, 380 Mass. 908, 917 (1980), quoting Lessard v. Schmidt, 349 F.Sup. 1078 (E.D.Wis. 1972) (three-judge court), vacated and remanded on other grounds, 414 U.S. 473 (1974).
431 Mass. 101, 105 (2000).

G.L.c. 123, §1 defines “likelihood of serious harm” as:
1. A substantial risk of physical harm to the person himself as manifested by evidence of, threats of, or attempts at, suicide or serious bodily harm;
2. A substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or
3. Avery substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person’s judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community.
G.L.c. 123, §1.