COMMONWEALTH *vs.* JAMES JOHN NASSAR, THIRD
(and a companion case[1]).

Berkshire.　March 4, 1980. — June 20, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Homicide. Practice, Civil,* Commitment of mentally ill person. *Practice, Criminal,* Acquittal by reason of insanity. *Insanity.*

Evidence that defendants were not guilty by reason of mental illness of the crime of manslaughter incident to the death of their child after they had abandoned him constituted "evidence of homicidal or other violent behavior" within the meaning of G. L. c. 123, § 1(2). [909-912]
Discussion of standards for involuntary commitment of mentally ill persons under G. L. c. 123, § 16(*b*). [912-918]

PETITIONS for commitment filed in the Superior Court Department on June 25, 1979.

The cases were reported to the Appeals Court by *Moriarty,* J. The Supreme Judicial Court, on its own initiative, ordered direct review.

*Francis X. Spina,* Assistant District Attorney, for the Commonwealth.
*Joseph W. Monahan, III,* for Patricia Anne Nassar.
*Michael J. Ripps* for James John Nassar, Third.
*Robert D. Fleischner & Marilyn Schmidt,* for the Mental Patients Advocacy Project, amicus curiae, submitted a brief.

KAPLAN, J. On May 15, 1979, after a bench trial in Superior Court, Berkshire County, the present respondents James John Nassar, III, and his wife Patricia Anne Nassar were found not guilty by reason of mental illness of the crimes of child abandonment (G. L. c. 119, § 39) and man-

---

[1] Commonwealth *vs.* Patricia Anne Nassar.

slaughter (G. L. c. 265, § 13) incident to the death of their sixteen months old, third child Joshua. Under the provisions of G. L. c. 123, § 16 (*a*), the judge ordered the respondents to be committed to the Department of Mental Health (Department) and hospitalized for observation. That observation having taken place, the district attorney petitioned the court under § 16 (*b*) for the involuntary commitment of the respondents to a facility. See generally *Commonwealth* v. *Killelea*, 370 Mass. 638, 647 (1976). After hearing, at which there was psychiatric testimony for the Commonwealth and for the respondents, the judge (who had not presided at the criminal trial) held that the respondents should be released from commitment, but, being doubtful about his decision involving the interpretation of the statute, he stayed entry of judgment and reported the case to the Appeals Court under G. L. c. 231, § 111, Mass. R. Civ. P. 64, 365 Mass. 831 (1974). We transferred the case here on our own motion. G. L. c. 211A, § 12.

A. We present an outline of the psychiatric testimony, first describing how these witnesses reconstructed the respondents' impulsions leading to the death. The respondents, twenty-five years (James) and twenty-four years old at the time of hearing, had been married some six years and had led a seminomadic, reclusive life, relying largely on handouts from others to keep themselves going. They believed they were sanctified and among those selected to be saved. Through prayers they communicated in a telepathic way with God and were given instructions what to do; but they had to be wary to sense which of the messages were truly from God. Any true instructions were to be obeyed without question. Since the respondents had to be available at all times to do God's bidding, they could not undertake to work for a living, although James occasionally did odd jobs. Nor would they accept welfare help or have dealings with any government agency.

The respondents had had four children. Two of them were born at home and their births were unrecorded. Because of the respondents' manner of life, the care of children

was burdensome for them. But they regarded the children as also sanctified. On occasion, in response to God's instructions, the respondents evidently ceased to feed their children, in the belief that the children's fast would help the unfortunate in India. The respondents no longer have custody of the two older children; it is understood that Sarah was given up for adoption in 1974 and Johanna was taken from the respondents in August, 1978, and placed in a foster home. See G. L. c. 119, §§ 32, 51B.

In September, 1977, the respondents received instructions to abandon Joshua; probably they had some expectation that he would be picked up and cared for by strangers. They believed they had left him at a church in Vermont and not on the steps of a church in North Adams where in fact he was found. When found, Joshua was dead; although no single cause could be ascribed, it was clear that the child was extremely malnourished. The respondents indicated they did not believe the dead child was Joshua. At the time of the abandonment of Joshua, Patricia was pregnant with Elizabeth. According to the respondents, this child, less than a year old, expired in her sleep, and it appears the respondents disposed of the body as garbage. Criminal proceedings against the respondents regarding this event were in process at the time of the § 16 (b) hearing.

To turn to the psychiatric analyses. The witnesses agreed that the respondents were gravely ill, suffering from chronic schizophrenia, paranoid type. Their divorce from reality was in the form of a strong shared delusional system, originating in religious belief but now corrupted or distorted. In following the will of God as communicated to them, the respondents felt no personal responsibility, and therefore they evinced no emotion about the two deaths or the fate of their other children. Their "affect" was flat. To restore the respondents to normality or something approaching it would require extensive psychotherapy and likely a separation of the pair to break up their mutually reinforcing mental patterns.

What could be expected if the respondents were released? It was common ground among all the witnesses that any

children born to the respondents — and they were a fecund couple[2] — would be in serious peril from them, and there was some inferential suggestion that this might apply to other children as well, at least if they should fall into the respondents' custody over a period of time. There was also agreement that at a stage in treatment where either respondent or both began to overcome the delusional system and started to recognize a responsibility for what had happened to their children, suicidal or aggressive behavior toward others might burst out. With respect to Patricia, in particular, there was testimony of powerful repressed rage and hostility.

These forecasts were contingent — on eventual access to children or breakdown of the paranoid system. As to more immediate prognosis, the testimony diverged.

On one side, it was suggested that the divine instructions might call for acts of omission or commission as serious as those in the case of Joshua, or worse, and not limited in object to a child. The orders if "true" would be followed by the respondents in automatic fashion, for they were relieved of any sense of individual responsibility or guilt. Especially if released together, the respondents would continue as prisoners of their delusional system. The Commonwealth, basing itself on this line of testimony, said it would be foolhardy to allow at large persons who had caused one death and were possibly involved in another, had escaped criminal punishment thus far only by reason of mental incapacity at the time, and were still sick and prepared to answer wayward instructions that might be projected by their own diseased imaginations.[3]

On the other side, witnesses suggested that the respondents if released would resume their isolated existence and a

---

[2] There was a suggestion at the hearing that James might voluntarily undergo a vasectomy.

[3] The district attorney expressed bewilderment that a psychiatrist who testified at the bench trial about the respondents' severe mental illness could now speak in terms suggesting that they could be safely released to the general population.

way of life that had been recessive rather than aggressive. The instructions they had received about Joshua reflected their inability to meet a child's needs and their response of abandonment was essentially negative. These witnesses were willing to extrapolate narrowly from Joshua's case to forecast danger to siblings, but they could see no significant current probability of peril to others or to the respondents themselves.

B. The legal question for the judge was posed by G. L. c. 123, § 8 (*a*),[4] as appearing in St. 1976, c. 356, § 3, which, to justify involuntary commitment, requires finding that "(1) such person is mentally ill, and (2) the discharge of such person from a facility would create a likelihood of serious harm." "Likelihood of serious harm" is defined by § 1:

"'Likelihood of serious harm', (1) a substantial risk of physical harm to the person himself as manifested by evidence of threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person's judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community."[5]

---

[4] Section 16 (*b*) in terms refers to § 8 (*c*) rather than § 8 (*a*) but, as the judge observed, that was a mistake brought in by St. 1976, c. 356, § 3, and the reference was plainly intended to be to § 8 (*a*).

[5] The Legislature rewrote G. L. c. 123 completely in 1970 (St. 1970, c. 888, § 4, with further amendment by St. 1971, c. 760). The former law was thought to be "confusing, inconsistent and inadequate, and the civil rights of the mentally ill [were] not properly protected." Report of the Special Commission on Mental Health, 1967 Senate Doc. No. 1129, at 5.

The new statute was intended to "modernize and clarify commitment procedures" and to provide those committed with "the highest possible standards of professional treatment." 1970 House Doc. No. 5021, at 2.

There was no question about the mental illness which had manifested itself in the conduct fatal to Joshua, and which continued.[6] As to "likelihood," each subdivision of the definition is predicated or conditioned on the manifestation of described "evidence." It will be seen in the following discussion that subdivision (2) is the critical one, and that there is doubt whether the judge interpreted it as we hold it should have been. Thus the case will be remanded for further proceedings. We subjoin a few other brief comments about the case.

1. Subdivisions (1) and (3) of the definition deal with a prospect of harm to the person whose commitment is sought. As to subdivision (1), the judge correctly held there was no evidence that the respondents had made threats of, or attempts at, suicide or serious bodily harm which "manifested" a "substantial risk of physical harm" to themselves. And as to subdivision (3), it was enough to say evidence was lacking that the respondents were unable to protect themselves in the community; they had, after all, managed to sustain themselves, however marginally, over a period of years.

2. Subdivision (2) deals with the prospect of harm to others. It calls for "evidence of homicidal or other violent behavior" or "evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them." These are two alternative predicates, and we concentrate on the first. We are of the opinion that that predicate was established by trial of the respondents for involuntary man-

---

The statute was one in "a trend toward restricting involuntary civil commitment to the dangerous mentally ill and toward limiting the type and increasing the severity of harm necessary to support a finding of dangerousness." Developments in the Law — Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190, 1205 (1974).

[6] General Laws c. 123 does not define "mental illness." In regulations, the Department of Mental Health provides that "[f]or purposes of involuntary commitment . . . 'mental illness' shall mean a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality or ability to meet the ordinary demands of life." 104 Code Mass. Regs. § 3.01(1)(a) (1978).

slaughter in which the crime was made out[7] except for the element of mental capacity in the *McHoul*[8] sense. The judge was prepared to concede that the respondents' behavior toward Joshua, resulting in his death, would be considered wanton or reckless conduct in sane persons, amounting to involuntary manslaughter; and it is plain enough that manslaughter (whether of the voluntary or involuntary type) is homicide. See *Commonwealth* v. *Webster*, 5 Cush. 295, 303-304 (1850). Nevertheless the judge appears to have taken the view — although not with complete clarity — that the first alternative clause was not satisfied because the homicide referred to had to be a "violent" one, whereas here the death came about through omissions or at any rate without a physical blow or other such impact. In other words, the judge read the words "homicidal or other violent behavior" as if "homicidal" was qualified by "violent." Without pausing to argue the question of the substantiality of a difference between omission and commission, especially as it might be apprehended by the victim, we take the position in the present context that homicide of any category is to be understood as in itself a violent crime, and "homicidal . . . behavior" should be read in the same manner. It seems reasonable that a recent episode of manslaughter combined with severe mental illness should qualify a person for consideration for commitment — although, as we shall see, it does not conclude the question. On the linguistic side, our interpretation seems to us to agree with common acceptation in the classification of crimes. For example, where parole is concerned, and a distinction taken between violent and other crimes, all homicide, including manslaughter of either type, falls to the violent side.[9]

---

[7] The parties evidently agreed that the finding of not guilty by reason of mental illness presupposed a finding of the elements of manslaughter other than the element of mental capacity. See *Gleason* v. *West Boylston*, 136 Mass. 489, 490 (1884). See also Walker, Mental Health Reform in Massachusetts, 53 B.U.L. Rev. 986, 1003 (1973).

[8] *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967).

[9] According to G. L. c. 127, § 133 (as appearing in St. 1965, c. 764, § 1), prisoners convicted of certain listed crimes are not eligible for parole until

It is of some interest that before the revision of c. 123 in 1970, § 101 of that chapter (stemming from St. 1923, c. 467, § 3) stated: "If a person indicted for murder or manslaughter is acquitted by the jury by reason of insanity, the court shall order him to be committed to a state hospital or to the Bridgewater state hospital during his natural life. The governor, with the advice and consent of the council, may discharge such a person therefrom when he is satisfied after an investigation by the department that such discharge will not cause danger to others." [10]   It is true that the 1970 amendments were intended to ameliorate the law (see n.5), but not, we think, to denature manslaughter, or involuntary manslaughter, to the extent intimated below.

3. That the first of the alternative conditions of subdivision (2) is found to exist does not in itself mean that the person should be committed. For the question remains whether

they have served at least two-thirds of their minimum sentence (but not less than two years). Other prisoners need only serve one-third of their minimum sentence (but not less than one year). The history of § 133, set forth in the Third Report of the Special Commission on Firearms, Paroles and Related Matters (1965 Senate Doc. No. 1151), indicates that the draftsmen intended to distinguish between "crimes of violence against the person and other crimes committed against society, and that the laws governing the release of those convicted and sentenced for crimes against the person must be more strict." See also *Bel* v. *Chernoff*, 390 F. Supp. 1256 (D. Mass. 1975) (three-judge court) (holding that G. L. c. 127, § 133, established two classifications of criminal activity — violent and nonviolent — with respect to parole eligibility); Rep. A.G., Pub. Doc. No. 12, at 148 (1967) (same interpretation). Manslaughter was included in the list of "violent" crimes; no exception was made for involuntary manslaughter where death is the unintentional result of wanton or reckless conduct.

In *Gahn* v. *Leary*, 318 Mass. 425 (1945), a case involving G. L. c. 38, § 6, which provided that "[m]edical examiners shall make examination upon the view of the dead bodies of only such persons as are supposed to have died by violence," we observed that "[d]eath 'by violence' comprehends death from other than natural causes, including poisoning." *Id.* at 427-428. See also *Liberty Nat'l Life Ins. Co.* v. *Morris*, 132 Ga. App. 631, 642 (1974) (defining "violent" similarly in context of accident insurance policy).

[10] In some situations means were found to procure discharge without going the gubernatorial route. *Wright, petitioner*, 350 Mass. 123 (1966). *Golden, petitioner*, 341 Mass. 672 (1961). Cf. *Baxstrom* v. *Herold*, 383 U.S. 107 (1966).

his release would create "a substantial risk of physical harm to other persons." This is a determination to be made in the first instance by the trial judge, and in the present case we apprehend that the issue — a probabilistic one — was not faced squarely because of the threshold difficulty with "homicidal behavior." We comment briefly on a few aspects of the issue which are mentioned or discussed in the briefs.

A person is not to be committed under the statute unless the substantial risk is proved by the Commonwealth beyond a reasonable doubt. We have fixed on this standard (see *Superintendent of Worcester State Hosp.* v. *Hagberg,* 374 Mass. 271, 276-277 [1978]), although it appears from the recent decision of the Supreme Court of the United States in *Addington* v. *Texas,* 441 U.S. 418, 433 (1979), that the nominally less exacting standard of "clear and convincing" proof could be constitutionally adopted. Various considerations involved in setting a standard are discussed in *Addington,*[11] and we need only say here that there is no anomaly in requiring proof beyond a reasonable doubt (or clear and convincing proof) of "substantial risk" which is itself implicitly a statement of probability. See *In re Ballay,* 482 F.2d 648, 664-667 (D.C. Cir. 1973); Developments in the Law — Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190, 1296, 1300 (1974). The "other persons" mentioned in the statute as at risk need not be an indifferent class of all persons; the class may be much narrower.[12]

The case of *Lessard* v. *Schmidt,* 349 F. Supp. 1078 (E.D. Wis. 1972) (three-judge court), vacated and remanded on other grounds, 414 U.S. 473 (1974), is cited on behalf of the respondents for the proposition that involuntary commit-

---

[11] "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' *In re Winship,* 397 U.S. 358, 370 (1970) (Harlan, J., concurring). " 441 U.S. at 423.

[12] Flaschner, The New Massachusetts Mental Health Code — A "Magna Carta" or A Magna Maze, 56 Mass. L.Q. 49, 51 (1971).

ment must be supported by a showing by the State of imminent danger of harm; this to assure that the individual's "potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty." *Id.* at 1093, quoting from *Humphrey* v. *Cady,* 405 U.S. 504, 509 (1972). See also *Suzuki* v. *Yuen,* 617 F.2d 173 (9th Cir. 1980); *Lynch* v. *Baxley,* 386 F. Supp. 378, 390 (M.D. Ala. 1974) (three-judge court). "Immediacy" is linked to the requirement of an enhanced standard of proof in the sense that the forecast of events tends to diminish in reliability as the events are projected ahead in time. Cf. Developments in the Law, *supra* at 1236-1245. We may accept, further, that in the degree that the anticipated physical harm is serious — approaches death — some lessening of a requirement of "imminence" seems justified. *Id.* at 1238. It is perfectly true that the assessments called for all along the line may be difficult; nevertheless there is no escape from making them under our statutory scheme. Cf. *Superintendent of Worcester State Hosp.* v. *Hagberg, supra* at 277.[13]

The cases and secondary writings discuss a doctrine of "least restrictive alternative" in connection with involuntary commitment of the mentally ill. See *Stamus* v. *Leonhardt,* 414 F. Supp. 439, 452-453 (S.D. Iowa 1976); *Welsch* v. *Likins,* 373 F. Supp. 487, 502 (D. Minn. 1974); *Lessard* v. *Schmidt, supra* at 1096; Chambers, Alternatives to Civil Commitment of the Mentally Ill: Practical Guides and Constitutional Imperatives, 70 Mich. L. Rev. 1107 (1972); Developments in the Law, *supra* at 1245. See also *Lake* v. *Cameron,* 364 F.2d 657, 660 (D.C. Cir. 1966). Regardless of the constitutional place of such a doctrine, either in general or in the particular context, we think it natural and right that all concerned in the law and its administration should strive to find the least burdensome or oppressive controls over the individual that are compatible with the fulfil-

---

[13] A fresh study of the treatment of persons found not guilty of crime by reason of mental illness, together with a draft of proposed legislation, is found in N.Y. Law Revision Comm'n, Report to the Governor on the Defense of Insanity in New York State (May 2, 1980).

ment of the dual purposes of our statute, namely, protection of the person and others from physical harm and rehabilitation of the person. The statute lends itself to this quest. Initial commitment can be justified only on the basis of strong proof, as we have seen. During commitment, the individual is entitled to "adequate and appropriate treatment" at the hands of the Department of Mental Health (G. L. c. 123, § 55 [e]), and the Department has available to it various means of adjusting the individual's program of treatment to the need. See G. L. c. 123, §§ 2, 4. See also 104 Code Mass. Regs. § 3.11(6) (1978). Further, the individual has the benefit of periodic revaluations of his case by both the Department and the court. See G. L. c. 123, §§ 4, 8 (d). The Department is to consider and reconsider (among other things) "all possible alternatives to continued hospitalization" (G. L. c. 123, § 4, as appearing in St. 1978, c. 367, § 71B), and this should enter also into the judicial reviews. The central involvement of the Department suggests to us, as it did in other circumstances in *Commonwealth* v. *Rodriguez,* 378 Mass. 632, 646-647 (1978), that the judge on remand may in his discretion wish to hear from those authorized to speak for the Department even in the course of initial consideration whether the respondents are to be released or held. We express no opinion on that question, which, as noted, is for the judge in the first instance.

The case will be remanded with liberty to the judge, in light of this opinion, to conduct such further hearings as to him may seem advisable, and thereupon to render decision.[14] Pending decision, the respondents will remain in the custody of the Department.[15]

*So ordered.*

---

[14] The judge should assure himself as to any changes in the condition of the respondents that may have come about since the last hearing.

[15] Mental Patients Advocacy Project filed a brief as a friend of the court.