NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-328                                        Appeals Court

IN THE MATTER OF D.K.


No. 18-P-328.

Middlesex.      January 11, 2019. - March 27, 2019.

Present:  Hanlon, Lemire, & Wendlandt, JJ.


Practice, Civil, Commitment of mentally ill person, Moot case.
     Moot Question.  Words, "Likelihood of serious harm."



     Petition for civil commitment filed in the Cambridge
Division of the District Court Department on July 11, 2016.

     The case was heard by Janet J. McGuiggan, J.


     Karen Owen Talley, Committee for Public Counsel Services,
for the defendant.
     Julia E. Kobick, Assistant Attorney General, for Department
of Mental Health.


     WENDLANDT, J.  This is an appeal from a decision and order

of the Appellate Division of the District Court, affirming an

order of involuntary civil commitment for mental illness issued

by a District Court judge pursuant to G. L. c. 123, § 16 (b).

The question on appeal centers on whether the evidence was

sufficient to establish a "likelihood of serious harm," as defined in G. L. c. 123, § 1. To answer this question, we apply principles regarding the temporal nature of evidence upon which this probabilistic assessment may rely.

In particular, the petitioner, Worcester Recovery Center and Hospital (WRCH), a Department of Mental Health (DMH) facility, presented evidence that the respondent, D.K., had required emergency hospitalization nearly two years earlier when she was found in a life-threatening condition, severely malnourished, and in a state of squalor, after failing to take medication to treat her mental illness, schizophrenia. We agree with D.K. that such evidence alone may be insufficiently proximate in time to make the requisite showing of imminence and risk under prong three of the statutory definition of "likelihood of serious harm." Here, however, WRCH also presented evidence that, at the time of the civil commitment hearing, D.K. was suffering from delusions of persecution, thought and perceptual disturbances, and as had occurred prior to the aforementioned emergency hospitalization, she was refusing psychiatric treatment and declining to bathe or change her clothing despite repeated offers of assistance by WRCH staff members. Together with the evidence of the extreme state in which she had presented in her prior hospitalization, this

evidence was sufficient to support the legal conclusion required under prong three.  Accordingly, we affirm.

Mootness.  We note that the civil commitment order expired before the Appellate Division decided the appeal.  "In the context of involuntary hospitalization, '[a]lthough an expired or terminated [commitment] order may no longer have operative effect, [an] appeal should not be dismissed without considering the merits of the underlying [commitment] order.'"  Matter of M.C., 481 Mass. 336, 343 (2019), quoting Matter of F.C., 479 Mass. 1029, 1029-1030 (2018).  In light of this, D.K.'s "case is not moot, and we decide [her] claims on the merits."  Matter of M.C., supra.

Background.[1]  At the time of the civil commitment hearing, D.K. was thirty-one years old.  She was homeless and faced criminal charges of three counts of trespass, pursuant to G. L. c. 266, § 120, one count of disorderly conduct, pursuant to G. L. c. 272, § 53, and one count of assault and battery on a person age sixty or over or with a disability, pursuant to G. L. c. 265, § 13K (a 1/2).  A District Court judge (trial judge) ordered a competency evaluation pursuant to G. L. c. 123, § 15,

---

[1] On appeal, D.K. does not dispute the evidence presented by WRCH at the civil commitment hearing; instead, her challenge centers on the legal conclusion regarding "likelihood of serious harm" that this evidence supports.

which was done at WRCH.  Following the evaluation, D.K. was found incompetent to stand trial.

WRCH filed the present petition pursuant to G. L. c. 123, § 16 (b), seeking to commit D.K. for a period not to exceed six months.  At the civil commitment hearing before a different District Court judge (hearing judge), WRCH presented evidence that D.K. suffered from schizophrenia,[2] a mental disorder of thought and perception.  John V. Gilmore, Jr., a forensic psychologist at WRCH, was WRCH's sole witness.[3]  Dr. Gilmore testified that D.K. had "delusions of persecution," including a belief that "she was being targeted."  Dr. Gilmore noted that D.K. had "impairments in the form of her thinking," "apparent thought-blocking," and "thought disturbance."  Over the course of D.K.'s two-month evaluation at WRCH, she was observed nine times "appearing internally preoccupied, inappropriate[ly] laughing as if responding to internal stimuli . . . [and] complaining of perceptual disturbances."  She was unable to care for her hygiene and grooming, declining to shower and wearing the same clothes despite repeated offers of assistance from the

---

[2] On appeal, D.K. does not dispute this diagnosis.

[3] D.K. refused to allow Dr. Gilmore to examine her during the two months she was at WRCH, where she had resided since the trial judge had ordered the competency evaluation.  However, Dr. Gilmore explained that his testimony regarding D.K. was based on his own observations of D.K., review of her medical records, and consultation with other professionals involved in her care.

staff. Although D.K. was consuming food and fluids while she was in the WCRH's supervised setting, Dr. Gilmore opined that, based on her current symptoms and lack of treatment, D.K.'s judgment was so impaired that she posed a life-threatening risk to herself unless civilly committed. Dr. Gilmore relied on D.K.'s medical history -- namely, two other instances when D.K. lapsed into life-threatening conditions following her refusal to take medication after her discharge from prior hospitalizations.

Specifically, after her release in May 2013, from an approximately three-week-long hospitalization at Solomon Carter Fuller Center, another DMH facility,[4] D.K. was arrested on a default warrant in October 2013, and sent to the house of correction. She was not taking her medications, went on a "hunger strike," and had to be hospitalized. The record on appeal does not contain additional information about D.K.'s state prior to this hospitalization, which occurred in October 2013 -- nearly three years before the civil commitment hearing.

More recently, after an approximately seven-month-long hospitalization at WRCH during which D.K. had achieved stabilization and was taking her medication,[5] she was released

---

[4] D.K. had been hospitalized from April to May 2013.

[5] D.K. was hospitalized at WRCH from December 2013 to July 2014. She was discharged in July 2014, following evaluation by Dr. Gilmore in May 2014 in which he opined that she had been

into the community in July 2014 and offered continuing psychiatric services by DMH. Within days or weeks of her release, D.K. stopped taking her medications and left for New York to visit a relative. In October 2014, she was found in an extreme state of uncleanliness and severely malnourished and dehydrated at a shelter. "She was not getting out of bed. She was urinating on her linens. She wasn't showering. There were yellow cups near her bed that she [said were] vomit, because she had been too weak to get [up]." According to Dr. Gilmore, her weight loss was so alarming that she was hospitalized on an emergency basis at Massachusetts General Hospital (MGH) in "a life-threatening medical condition," and given emergency intravenous fluids. As discussed supra, this hospitalization occurred in October 2014 -- nearly two years before the civil commitment hearing. D.K. was discharged from MGH, and in February 2015, she was committed overnight pursuant to G. L. c. 123, § 12, because she was "[e]xperiencing disturbing voices with suicidal content."[6]

---

stabilized due to her medications and was then-competent to stand trial.

[6] During oral argument before the Appellate Division, counsel for WRCH indicated that D.K. had been hospitalized for two weeks in "January/February 2015" due to "dehydration and the potential life-threatening condition she was in." The record before the hearing judge, however, does not indicate any reference to this two-week hospitalization. Accordingly, we do not consider this statement in our analysis.

The record is devoid of any information regarding D.K.'s condition from February 2015 until June 2016, when she was sent by the trial judge for an evaluation of her competency to stand trial on the aforementioned charges.[7]  She was not malnourished; however, she was not taking any medications[8] and refused psychiatric treatment for her mental illness.  She was not tending to her hygiene for at least a period of two months, refusing to bathe or change her clothing.  Significantly, this state mirrored the state in which she had been found just prior to her emergency hospitalization in October 2014.

According to Dr. Gilmore, D.K. lacked insight into her condition and did not "appear to have insight into her need to have treatment at all."  Although D.K. earlier had spent approximately seven months at WRCH (from December 2013 to July 2014), she denied that she had previously been at the facility.  D.K. also did not recognize Dr. Gilmore, although he had evaluated her in May 2014 during her prior hospitalization at

---

[7] D.K. was also hospitalized at a private facility, Arbour-Fuller, but neither the details of her condition during this hospitalization nor the timing thereof is in the record.

[8] At the time of the hearing, the only medicine prescribed was "PRN," indicating that D.K. was to take the medication as needed.

WRCH.[9]  Finally, Dr. Gilmore also opined that a locked recovery center, like WRCH, was the least restrictive placement appropriate for D.K. in view of her condition.[10]

D.K. testified on her own behalf.  She stated that she had been eating "fine" under the supervision of WRCH, she did not intend to stop eating if transferred to jail, and she hoped to make bail and live with a friend.  She stated that she did not "remember being on medications in the hospital, but outside in the community."  She acknowledged stopping those medications. She did not recognize that she had schizophrenia and believed her prior medications were for depression.

The hearing judge issued an order committing D.K. for a period not to exceed six months.  D.K. appealed to the Appellate Division.  The Appellate Division affirmed the order and dismissed the appeal, and this appeal followed.

Discussion.  WRCH filed the petition pursuant to G. L. c. 123, § 16 (b), which in turn requires the judge to make findings required under G. L. c. 123, § 8 (a).  Section 8 (a) permits civil commitment only if the judge finds beyond a

---

[9] In May 2014, Dr. Gilmore opined that, D.K. had been stabilized due to her medications and was then competent to stand trial.

[10] D.K. moved for a required finding at the close of WRCH's case, which was denied.

reasonable doubt[11] that the respondent is mentally ill and that her discharge "would create a likelihood of serious harm." "Likelihood of serious harm" is defined in G. L. c. 123, § 1, as:

> "(1) a substantial risk of physical harm to the person himself as manifested by evidence of, threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person's judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community."

At the hearing, Dr. Gilmore opined that neither prong one or two applied to D.K.  WRCH proceeded on the theory that prong three was met.  Thus, the question on appeal is whether the evidence supported the legal conclusion that there was an imminent and "very substantial risk of physical impairment or injury" to D.K. by virtue of her judgment being so adversely affected by her mental illness that she could not protect herself from physical harm.  See Matter of G.P., 473 Mass. 112, 128-129 (2015).  In

---

[11] "A person is not to be committed under the statute unless the substantial risk is proved by the [petitioner] beyond a reasonable doubt." Commonwealth v. Nassar, 380 Mass. 908, 916 (1980).  See Superintendent of Worcester State Hosp. v. Hagberg, 374 Mass. 271, 276 (1978) (standard of proof for G. L. c. 123, §§ 7-8, civil commitment proceeding is proof beyond reasonable doubt).

particular, D.K. maintains that the evidence of her prior hospitalizations was insufficiently proximate in time to make the requisite showing.

1. Standard of review. We review the hearing judge's findings of fact for clear error. This is because the judge, having presided over the hearing, was in the best position to weigh the evidence and to assess witness credibility. See G.E.B. v. S.R.W., 422 Mass. 158, 172 (1996), and cases cited. We "scrutinize without deference the propriety of the legal criteria employed by the trial judge and the manner in which those criteria were applied to the facts." Matter of A.M., 94 Mass. App. Ct. 399, 401 (2018), quoting Iamele v. Asselin, 444 Mass. 734, 741 (2005). See, e.g., Matter of G.P., 473 Mass. at 129-130 (deferring to judge's subsidiary findings in G. L. c. 123, § 35, civil commitment, but reviewing without deference legal conclusion that required showing whether "a substantial risk of serious harm to others" was met); Commonwealth v. DelVerde, 401 Mass. 447, 450-452 (1988) (applying clear error standard to judge's subsidiary findings in G. L. c. 123, §§ 8 & 16, proceeding, but reviewing sufficiency challenge without deference).

2. Evidence of an imminent and "a very substantial risk" under prong three. Viewed in isolation, D.K.'s prior hospitalizations -- the most recent of which occurred nearly two

years prior to the hearing -- may not have been sufficiently proximate in time to sustain the showing of an imminent and very substantial risk of physical impairment or injury.  As the court noted in Matter of G.P., 473 Mass. at 126, in connection with prong one, "as a matter of experience and logic, the more recent the evidence of threats or attempts of suicide or infliction of serious bodily harm, the more weight that evidence should carry in supporting a determination that there is a significant risk of self-harm."  The corollary, of course, is that evidence from further back in time carries less weight because "the forecast of events tends to diminish in reliability as the events are projected ahead in time."  Commonwealth v. Nassar, 380 Mass. 908, 917 (1980).

The value of such remote evidence diminishes even more rapidly with regard to prong three, where "the imminence of the risk becomes a factor that is even more important to consider than it is with respect to the other two prongs."  Matter of G.P., 473 Mass. at 129.  This is because, while prongs one and two require a showing of a "substantial risk" of harm to self or others, prong three requires "a very substantial risk" of harm to self and "requires more certainty that the threatened harm will occur."  Id. at 128.

This does not mean, however, that evidence going back in time is irrelevant in making the assessment of risk required

under prong three.  As the court stated in Matter of G.P., 473 Mass. at 125, "[i]t is neither possible nor appropriate to try to establish a set of definite temporal boundaries for such evidence; the assessment of risk is a probabilistic one, and necessarily must be made on the basis of the specific facts and circumstances presented."  Moreover, the more serious the anticipated physical harm, and in particular, as it approaches death, "some lessening of a requirement of 'imminence' seems justified."  Nassar, 380 Mass. at 917.  Here, the evidence was that two years ago, D.K.'s judgment was so affected by her mental illness that she was unable to protect herself from a life-threatening condition.  Thus, although this evidence was from two years prior to the hearing, it nonetheless is significant "in making a positive risk assessment about likelihood of harm."  Matter of G.P., supra at 126.

Specifically, the evidence of D.K.'s prior condition placed in context the risk presented by her present condition, which included that she presently was experiencing thought and perceptual disturbances, believed she was being persecuted, was responding inappropriately to internal stimuli, and was unaware of her diagnosis and need for treatment.  D.K. was refusing psychiatric treatment and was not bathing or changing her clothes, even though she was offered assistance at least ten times during the course of her two-month stay at WRCH prior to

the hearing. These latter behaviors were significant not in isolation, but because they echoed some of the conduct D.K. had exhibited just prior to her emergency hospitalization almost two years earlier,[12] when she was found in a life-threatening condition. At that time, she was also not taking medications and not showering, and she was languishing in extremely unsanitary conditions. So, while she was eating or drinking during her supervised stay at WCRH, the prior hospitalization provided evidence relevant to the risk assessment that was required. See Matter of G.P., 473 Mass. at 125-126. Her current condition viewed in the context of her prior hospitalization support the conclusion that there was an imminent and a very substantial risk of physical impairment or injury as a result of the impact of D.K.'s mental illness on her judgment.[13]

---

[12] Because the evidence of D.K.'s present state, coupled with her hospitalization two years ago, support the legal conclusion required under prong three, we need not consider either the hospitalization in 2013 for a "hunger strike" or the February 2015 hospitalization for hearing voices with suicidal content. Notably, however, Dr. Gilmore testified that D.K. was not suicidal and that she was eating.

[13] On appeal, D.K. contends for the first time that WRCH failed to show, beyond a reasonable doubt, that reasonable provision for her protection is not available in the community. The issue was not raised before the Appellate Division. Accordingly, D.K. has waived this argument. See Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006), quoting Century Fire & Marine Ins. Corp. v. Bank of New England-Bristol County,

<u>Decision and order of
Appellate Division
affirmed</u>.

N.A., 405 Mass. 420, 421 n.2 (1989) ("An issue not raised or argued below may not be argued for the first time on appeal").