NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-282

IN THE MATTER OF C.S.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The respondent, C.S., appeals from a June 2021 order of a District Court judge committing her to Worcester Recovery Center and Hospital (Worcester) for a period of one year, pursuant to G. L. c. 123, §§ 7 and 8.  At the time she was committed C.S. was diagnosed with schizophrenia, which caused, among other symptoms, delusional thinking.  C.S. had been previously civilly committed in 2020, after she was hospitalized in 2019 because she was suffering from a whole-body lice infestation that caused her to pull out her hair and scratch her skin.  While committed, C.S. needed staff support to complete her activities of daily living.

On appeal C.S. argues that the evidence adduced in the 2021 hearing was insufficient as to two required findings, (1) that there would be an imminent "likelihood of serious harm" if C.S.

were discharged, G. L. c. 123, § 8 (a), and (2) that there were no less restrictive alternatives to her commitment. See Matter of J.P., 486 Mass. 117, 118-119 (2020). C.S. also argues that Worcester failed to prove that C.S. had been subject to a prior commitment under chapter 123. For the reasons that follow, we affirm the order of commitment.

Background. Based on the record before her, the judge could have found the following facts. The respondent, C.S., had been without housing intermittently for over twenty years. In October of 2019, C.S. was admitted to a hospital emergency room; at that time C.S. had an infestation of lice covering her body, and she had scabs from scratching at the lice. She was pulling out her hair and keeping it in a plastic bag. She was also very thin.[1]

Following her stay in the emergency room, C.S. was admitted to Pembroke Hospital (Pembroke), and from Pembroke, C.S. was transferred to Worcester.[2] At some point, Worcester obtained a

_____

[1] While in the emergency room, C.S. claimed that she did not need health insurance, because she was covered by pet insurance in Maine.

[2] C.S.'s Pembroke record includes an admission form, with a box checked that she was "well developed," "well-nourished," and "does not appear to be acutely or chronically ill." This was contradicted by the testimony of C.S.'s sister as to the lice infestation.

civil commitment order over C.S., prior to the pendency of this case.

In May of 2021, Worcester filed the instant petition pursuant to G. L. c. 123, §§ 7 and 8, seeking a one-year commitment. In its petition Worcester stated that C.S. was, at that time, under an order of commitment expiring on June 2, 2021. In June of 2021, the District Court held two hearings, at which C.S.'s sister and Dr. Caussade, C.S.'s attending psychiatrist at Worcester, testified. Dr. Caussade testified at length regarding his observations of C.S., and his clinical opinions in this case.

In Dr. Caussade's clinical opinion, C.S. was suffering from schizophrenia; this opinion was based on C.S.'s delusional thinking and distorted perception, causing her to respond to stimuli that only she could perceive.[3] Among C.S.'s delusions were that she had an apartment she could live in if discharged, that Worcester was planning to force feed her with a feeding tube, and that she did not have a brain (and thus, she did not have a mental illness). C.S. also stated that as she did not have a mental illness, she did not need treatment or medication; she would only take medication if ordered to do so by the court.

---

[3] Dr. Caussade testified that "[C.S.] is often seen responding to voices that only she can hear, stimuli that only she can hear. So she is constantly seen as internally preoccupied."

Dr. Caussade opined that C.S.'s schizophrenia rendered her unable to meet the ordinary demands of life. In Dr. Caussade's opinion, "[C.S] would not be able to find medical care, seek resources, [would have] difficulty seeking shelter, medical care, food, income, resources in general. She's seen as not being able to achieve these things at this time."[4] While at Worcester, C.S. engaged in her activities of daily living with staff support, but in Dr. Caussade's opinion, she would not be able to complete such activities without staff support. Furthermore, Dr. Caussade opined that C.S. is "unable to fully grasp the risks and benefits or the reality of any treatment planning and discharge planning or life in the community," and that C.S. would not engage in psychiatric care in the community. To the best of Dr. Caussade's knowledge, there was no homeless shelter available to C.S., nor was there any less-restrictive alternative available in the community.[5] A locked psychiatric

_____

[4] C.S.'s sister further testified that C.S. lacks attention to medical issues. C.S.'s teeth are discolored and one is cracked; she refuses to go to the dentist. Furthermore, she refused to have an electrocardiogram performed, despite a history of cardiac issues in the family. C.S. had received her COVID-19 vaccine, however. At the time of the hearing, C.S.'s sister had a temporary guardianship over her.

[5] For some period of time, Worcester's discharge plan for C.S. was for C.S. to be discharged to a live-in shelter. However, Worcester reconsidered its discharge plan after observing the extent of C.S.'s delusional thinking.

4

facility was the least restrictive placement available at the time of the hearing, Dr. Caussade testified, because "[e]ven with treatment right now, she still needs staff support to maintain her [activities of daily living], as well as receiving medication.  Steps to find the least-restrictive alternative have not been fruitful thus far.  Therefore, anything less than what she's getting now would lead to her decompensating."

Following the second hearing, the judge ordered that C.S. be committed to Worcester for one year.[6]  The judge found that C.S. was "[m]entally ill as defined by [104 Code Mass. Regs. § 27.05] in accordance with G. L. c. 123, § 2," that "[f]ailure to retain [C.S.] in a facility would create a likelihood of serious harm," and that "[t]here is no less restrictive alternative for [C.S.]."  C.S. appealed to the Appellate Division of the District Court, which affirmed.

Discussion.  1.  Sufficiency of the evidence.  C.S. first challenges the sufficiency of the evidence justifying her commitment.  "In our review of the sufficiency of the evidence, we accept the findings of fact made by the hearing judge unless clearly erroneous; however, we review without deference whether

---

[6] This commitment order has now expired.  The matter is not moot, however, as "[a]n individual has a personal stake in the outcome of litigating an appeal from an order of civil commitment, even after the individual is released."  Matter of J.P., 486 Mass. at 120 n.7, quoting Matter of a Minor, 484 Mass. 295, 300 (2020).

5

the legal standard for civil commitment was met." Matter of J.P., 486 Mass. at 121. An order of civil commitment pursuant to G. L. c. 123, §§ 7 and 8, must be supported by findings that "(1) such person is mentally ill, and (2) the discharge of such person from a facility would create a likelihood of serious harm." Matter of J.P., supra at 118, quoting G. L. c. 123, § 8 (a). "The harm must be shown to be imminent, that is, it will materialize 'in days or weeks rather than in months.'" Matter of J.P., supra at 119, quoting Matter of G.P., 473 Mass. 112, 128 (2015). The judge must also find "that there is no alternative that is less restrictive than hospitalization." Matter of J.P., supra at 118. The standard of proof is beyond a reasonable doubt. Pembroke Hosp. v. D.L., 482 Mass. 346, 348-349 (2019). C.S. challenges the "likelihood of serious harm" and "least restrictive alternative" findings; we take each in turn.

a. Likelihood of serious harm. Pursuant to G. L. c. 123, § 1, "likelihood of serious harm" can be proven three ways; we are concerned with the third of these -- whether the evidence showed "[(1)] a very substantial risk of physical impairment or injury to [C.S.] as manifested by evidence that such person's judgment is so affected that [s]he is unable to protect [her]self in the community and [(2)] that reasonable provision

6

for [her] protection is not available in the community."[7] G. L. c. 123, § 1. See Matter of P.R., 488 Mass. 136, 140 (2021). In conducting the "very substantial risk" analysis, "[t]he focus of the evidence . . . must be on [C.S.'s] degree of impaired judgment due to mental illness and the degree of likelihood that, as a direct consequence, [C.S.] will sustain or inflict injury" (alteration omitted). Id. at 141, quoting Matter of G.P., 473 Mass. at 129.

C.S. argues that the evidence failed to meet the very substantial risk of harm standard. In particular, C.S. asks us to discount the evidence of her lice infestation and weight loss when she was first committed in 2019, noting that her intake form at Pembroke did not list those conditions; she also emphasizes that she had lived in the community for twenty years prior to her hospitalization, and that if she were discharged she would have support in the community from her sister and the Department of Mental Health.[8]

---

[7] The Supreme Judicial Court has treated the unavailability of "reasonable provision for [her] protection . . . in the community" standard as equivalent to the "least restrictive alternative" standard. G. L. c. 123, § 1. See Matter of P.R., 488 Mass. 136, 140 n.7 (2021). We analyze C.S.'s challenge under the "least restrictive alternative" standard, infra.

[8] C.S. also argues that lack of housing alone is not enough to support a finding of a very substantial risk of harm, see Matter of J.P., 486 Mass. at 124-125. Here, however, the findings were not based on lack of housing, but on C.S.'s inability to care for herself and to avoid harm.

C.S.'s arguments, however, go to the weight of the evidence, not to its sufficiency. The fact finder was not required to credit the Pembroke intake form, where C.S. had just been hospitalized and C.S.'s sister testified to the seriousness of C.S.'s condition at the time. Nor was the judge required to balance the evidence in the way C.S. would prefer. Here, the evidence included testimony that C.S.'s judgment was grossly impaired as a result of her delusional beliefs, that C.S. resisted taking medication, and that without her medication, C.S.'s condition would deteriorate to her state in 2019 -- when she suffered from a whole-body lice infestation, was pulling her hair out, and had become very thin, such that hospitalization was required. Additionally, C.S.'s treating psychiatrist testified that C.S. was not able to accomplish her activities of daily living on her own, but could only do so with staff support.

Our review here is informed by the Supreme Judicial Court's decision in Matter of P.R., in which a respondent, who had paranoid schizophrenia, increased the flow from his prescribed oxygen tank to harmful levels, believing that such levels were necessary, and refused medication, believing such to be poisoned. Matter of P.R., 488 Mass. at 138, 141. Though the respondent in P.R. was no longer prescribed oxygen, and thus could no longer harm himself with his oxygen tank, "the

8

underlying issues that created the 'very substantial risk of physical impairment or injury' . . . still were present," and the judge accordingly could properly find a very substantial risk of harm. Id. at 141, quoting G. L. c. 123, § 1. Similarly, C.S.'s impaired judgment by result of mental illness had previously led to injury -- namely the severe lice infestation, malnourishment, tooth decay, etc. -- and this impaired judgment was still present at the time of the hearing. See Matter of P.R., supra. See also Matter of D.K., 95 Mass. App. Ct. 95, 101-102 (2019) (evidence regarding respondent's life-threatening condition from two years prior relevant to "very substantial risk" analysis, where respondent exhibited similar behaviors both two years prior and immediately prior to hearing).

b. Least restrictive alternative. In conducting the "least restrictive alternative" analysis, "the proper focus is on whether there are any viable, plausibly available options that bring the risk of harm below [a very substantial risk]." Matter of a Minor, 484 Mass. 295, 310 (2020).

C.S.'s primary argument as to this prong is that Worcester needed to introduce the records from its required periodic review of C.S.'s case, see G. L. c. 123, § 4, and to specifically show that Worcester had considered as part of that

9

review "all possible alternatives to continued hospitalization."[9] We disagree, however, that Worcester was required to present these particular documents. Rather, Worcester needed to show that it had considered whether less restrictive alternatives existed, and if so, why they had not been employed. Here Worcester carried its burden. Dr. Caussade testified that Worcester had explored discharging C.S. to a live-in shelter, but decided against doing so after observing the extent of C.S.'s delusions. The evidence reflected that C.S. needed staff support to maintain her activities of daily living and to receive medication. See Matter of J.D., 97 Mass. App. Ct. 15, 22 (2020) ("[respondent's] amenability to treatment is essential to whether [she] could have been placed in a less restrictive setting"). Dr. Caussade also testified that there were no facilities available that could accommodate C.S.'s needs at the time of the hearing. Accordingly, there was sufficient evidence that there were no less restrictive alternatives to commitment at Worcester.

---

[9] C.S. points out that, in Commonwealth v. Nassar, 380 Mass. 908 (1980), the court stated "[t]he Department [of Mental Health] is to consider and reconsider . . . 'all possible alternatives to continued hospitalization' . . ., and this should enter also into the judicial reviews." Id. at 918, quoting G. L. c. 123, § 4. But while the Nassar court stated that the court should consider "all possible alternatives," the court did not impose an evidentiary requirement that petitioners introduce particular records.

2.  Proof of prior commitment.  C.S. also asserts that because Worcester was seeking a one-year commitment, Worcester was required to introduce evidence at the hearing that C.S. had previously been committed.  See G. L. c. 123, § 8 (d) (first order of commitment under § 8 valid for six months; subsequent commitments valid for one year).  This, C.S. asserts, was an element of Worcester's case; furthermore, C.S. asserts that Worcester's failure to prove a prior commitment divested the trial court of "jurisdiction."

We perceive no error.  To begin, we note that this argument was not raised at the commitment hearing.  Indeed, Worcester's petition itself stated that C.S. was then committed to Worcester pursuant to a commitment order that expired June 2, 2021.  That assertion was unchallenged throughout the proceedings below.  The argument that prior commitment was not shown is accordingly waived.  See Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006), quoting Century Fire & Marine Ins. Corp. v. Bank of New England-Bristol County, N.A., 405 Mass. 420, 421 n.2 (1989) ("An issue not raised or argued below may not be argued for the first time on appeal").  Moreover, we do not agree that proof of a prior commitment is an "element" of the petitioner's case, or that a failure to demonstrate a prior commitment is

11

"jurisdictional."[10]  Whether the respondent has been previously committed defines aspects of the process to be employed, namely, the time by which the hearing must be commenced and the permissible period of commitment.  See G. L. c. 123, §§ 7 (c), 8 (d).  In that sense, whether the respondent had been previously committed is a matter of proper process, like the adequacy of venue or the sufficiency of service of process; it is not an element of the petitioner's case, nor a matter of subject matter jurisdiction.  Cf. M.B. v. J.B., 86 Mass. App. Ct. 108, 115 (2014), quoting Paige v. Sinclair, 237 Mass. 482, 484 (1921) (venue is "commonly matter of abatement and does not go to the jurisdiction of the court," and may be waived); Raposo v. Evans, 71 Mass. App. Ct. 379, 385-386 (2008) ("A defendant who challenges service of process in his answer must move to dismiss within a reasonable time, prior to substantially participating in discovery and litigating the merits of the

---

[10] "Subject matter jurisdiction concerns the power of the court to entertain a particular category of case." Commonwealth v. Doughty, 491 Mass. 788, 805 (2023).  In this case, there can be no question that the petition was properly before the District Court.  Put differently, C.S. does not argue that the court was without power to commit her; she argues that the commitment was unlawful because the Commonwealth needed to put in additional proof to justify the use of the one-year commitment procedure.  This argument does not implicate the court's subject matter jurisdiction.

12

case," or defense will be waived).  The judge did not err in ordering a one-year commitment based on the evidence before her.

<u>Order of civil commitment
affirmed</u>.

By the Court (Englander,
Hodgens & Smyth, JJ.[11]),

Clerk

Entered:  May 22, 2025.

---

[11] The panelists are listed in order of seniority.