NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-898

IN THE MATTER OF C.B.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

C.B. appeals from a decision and order of the Appellate Division of the District Court, which affirmed a District Court order granting a petition for involuntary civil commitment filed by Bridgewater State Hospital (BSH) pursuant to G. L. c. 123, § 16 (b). C.B. contends that BSH failed to prove, beyond a reasonable doubt, that (1) he would pose a "likelihood of serious harm" if not placed in the strict security of BSH, G. L. c. 123, § 8 (b), and that (2) if he would pose such a risk, he "is not a proper subject for commitment" to any other Department of Mental Health (DMH) facilities. C.B. also argues that BSH failed to prove that there is "no less restrictive alternative" to the strict security at BSH.[1]  Matter of E.C., 479 Mass. 113,

_____

[1] C.B. also initially argued that the District Court lacked subject matter jurisdiction to grant the BSH petition because the initial order committing C.B. to BSH for a competency

121 (2018). We conclude that BSH failed to provide sufficient evidence to support a finding beyond a reasonable doubt that C.B. posed a likelihood of serious harm if not placed in the strict security of BSH, and therefore we reverse.[2]

Background. 1. Procedural history. On January 23, 2020, C.B. was charged with four offenses in the Orange District Court.[3] On January 24, 2020, a judge of that District Court (criminal court) granted a motion filed by C.B.'s defense attorney for evaluation of C.B.'s mental competency by a clinician pursuant to G. L. c. 123, § 15 (a). On February 7, 2020, based on the recommendation of the clinician and over C.B.'s objection, the criminal court judge ordered an evaluation, at BSH, of C.B.'s competency to stand trial and capacity for criminal responsibility, pursuant to G. L. c. 123, § 15 (b). On February 25, 2020, the judge issued an order for C.B.'s hospitalization and examination at BSH pursuant to G. L.

---

evaluation, which entered in a different District Court pursuant to G. L. c. 123, § 15 (b), was unlawful for not considering less restrictive alternatives. See Commonwealth v. A.Z., 493 Mass. 427, 432 (2023). He withdrew this argument in his reply brief.

[2] Although C.B. is no longer subject to commitment, this appeal is not moot. See Matter of F.C., 479 Mass. 1029, 1029-1030 (2018).

[3] The charges were assault and battery on a person sixty years of age or older, G. L. c. 265, § 13K (a 1/2); strangulation or suffocation, G. L. c. 265, § 15D (b); assault to kill, G. L. c. 265, § 18 (a); and assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A (a).

c. 123, § 15 (b).  C.B. was admitted to BSH on February 26, 2020.  On March 3, 2020, the criminal court judge granted a request by BSH for an extension of the evaluation to April 3, 2020.  On April 3, 2020, the criminal court issued an order finding C.B. incompetent to stand trial.

On the same day, the medical director for BSH filed a petition with a different District Court, the Brockton District Court (civil court), for C.B.'s commitment to BSH pursuant to G. L. c. 123, § 16 (b), alleging that C.B. posed a substantial risk of physical harm to other persons.  On May 27, 2020, a judge of the civil court granted the petition after conducting a virtual hearing.

On June 5, 2020, C.B. appealed from the commitment order, arguing the evidence was insufficient to establish that (1) C.B. requires the strict security of BSH, and (2) failure to hospitalize him would "create a likelihood of serious harm." G. L. c. 123, § 8 (b).  The Appellate Division affirmed the commitment order on March 22, 2024, ruling that the civil court had jurisdiction to issue the commitment order and BSH had offered sufficient evidence to support commitment.  On April 19, 2024, C.B. filed a notice of appeal to this court.

2.  The long-term commitment hearing.  During the May 27, 2020, commitment hearing in the civil court, only C.B. and Dr.

Kelley, BSH's expert witness, testified. No exhibits were entered in evidence at the hearing.

Dr. Kelley first opined that C.B. was incompetent to stand trial in the criminal court, because he was "exhibiting significant deficits in those abilities associated with competence to stand trial." She specified that C.B. held "delusional beliefs that he is connecting to aspects of his legal charges." C.B. was also "suspicious of his current attorney" in the criminal case, and his communication with that lawyer was "guarded" and "defensive." As a result, Dr. Kelley stated that C.B.'s abilities to "weigh alternatives and make a rational choice" and "work with his current defense attorney" were impaired. The civil court judge made a finding that C.B. remained incompetent to stand trial in the criminal court.

Dr. Kelley then proceeded to testify to C.B.'s mental health conditions. She stated that C.B. met the DMH criteria for mental disorder "consistent with a diagnosis of an other specified schizophrenia spectrum and other psychotic disorder, with specific symptoms of delusional persecutory thinking." She opined that C.B.'s mental illness "has been going on for decades" and was first diagnosed in 2018, during an initial hospitalization of C.B. Dr. Kelley described C.B.'s symptoms to include being "highly sensitive to perceived threats," "heightened suspiciousness, guardedness and evidence of

4

continued delusional and persecutory thinking." According to Dr. Kelley, C.B. also had a "history of emotional instability," though he was "not currently exhibiting symptoms of a mood disorder."

Dr. Kelley concluded that C.B. required psychiatric hospitalization under the strict security of BSH. She opined that failure to hospitalize C.B. at BSH "would create a serious risk of harm to others by reason of mental illness." She based her opinion on C.B.'s continuing "symptoms of heightened suspiciousness" and "heightened sensitivity to threats," as well as C.B.'s unwillingness to acknowledge and manage his "mental health problems" or his "risk factors for violence." Another basis of Dr. Kelley's opinion was that C.B. "does not currently agree that he has mental health problems" and refused to take "any psychiatric medication." She supported her opinion by stating "[C.B.] had been (inaudible) of serious allegations of violence in connection with symptoms of mental illness." Dr. Kelley concluded that it was inappropriate to hospitalize C.B. to a DMH facility, since he required "close monitoring and supervision, in the event of acting out erratically against others."

During cross-examination, Dr. Kelley testified that C.B. was "currently exhibiting psychotic symptoms" and "disturbances in his thought processes." She admitted that C.B. had not been

5

"assaultive" or "threatening," or had any "behavioral write-ups," since he had been admitted to BSH. According to Dr. Kelley, C.B. was "sensitive to perceived threats" and was "easily unnerved by people asking about his mental health and his legal situation,"[4] but had not made any threats himself or assaulted anyone he perceived to be threatening since he came to BSH. Dr. Kelley testified she was informed by a nurse on C.B.'s treatment team that C.B. was "behaviorally stable" in the nurse's opinion, with "no current evidence of an active psychotic process or mood disturbance that would justify pursuing a Rogers order or treatment over --."[5] Dr. Kelley also reviewed records of C.B.'s previous hospitalizations at BSH and two other DMH facilities in 2018, and she testified that C.B. had no behavioral issue at one of those DMH facilities.

C.B. testified after Dr. Kelley. He testified that he had been committed to BSH since the end of February 2020, after he was incarcerated in a county jail for about a month. C.B. stated that while he was at BSH, he was allowed approximately two hours per day outside of his room due to restrictions from the COVID-19 pandemic. He had discussions with the treatment staff from both his room and elsewhere in the facility. He testified that he had not assaulted, threatened, or wanted to be

---

[4] Dr. Kelley made this statement during direct examination.

[5] Counsel's question was interrupted by an objection.

6

violent toward anyone at BSH.  C.B stated that he had been verbally assaulted and threatened by other patients, and he "scooted" when other patients threatened him.  C.B. then testified that he preferred not to go to a DMH hospital or get treatment because he "prefer[s] some more freedom that makes sense to people."  C.B. recalled his previous commitment to BSH for approximately three months in 2018 for evaluation, and his subsequent transfer to two other DMH facilities.[6]  He testified that he did not have any incidents of violence while receiving treatment in these facilities.

On cross-examination, C.B. stated that he was aware that there are allegations against him about assaulting his mother in January 2020.  C.B. admitted that he had not been taking antipsychotic medications since his hospitalization at BSH. C.B. acknowledged that he was involved in a land dispute.

After both C.B. and Dr. Kelley testified, the civil court judge credited Dr. Kelley's testimony.  The judge found that C.B. was mentally ill as defined under the statute and required commitment under the strict security of BSH.  The judge ordered C.B.'s commitment to BSH for a period not longer than six months.

---

[6] C.B.'s and Dr. Kelley's testimony differed as to the second facility at which he was hospitalized.  This difference is not material to our decision.

7

Discussion. 1. Legal framework. "General Laws c. 123, §§ 7 and 8, address the long-term commitment of persons with mental illness." Matter of J.D., 97 Mass. App. Ct. 15, 18 (2020). General Laws c. 123, § 8 (b), states that

> "the district court . . . shall not order the commitment of a person at the Bridgewater state hospital . . . unless it finds that (1) such person is mentally ill; (2) such person is not a proper subject for commitment to any facility of the [DMH]; and (3) the failure to retain such person in strict custody would create a likelihood of serious harm."

All three elements must be demonstrated beyond a reasonable doubt. Matter of J.P., 486 Mass. 117, 119 (2020), citing Matter of G.P., 473 Mass. 112, 119 (2015).

Specifically, G. L. c. 123, § 1, defines "likelihood of serious harm" to include "a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them." Thus, "[t]o conclude that a person poses a substantial risk of physical harm to others, a judge must find either '[1] evidence of homicidal or other violent behavior or [2] evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them.'" Matter of J.P., 486 Mass. at 121, quoting G. L. c. 123, § 1. "As to the likelihood of serious harm to others, 'the Legislature's use of the word "homicidal," and phrases such as "violent behavior" and "serious

8

physical harm" signifies an intent that evidence of conduct reflecting a substantial level of force and intensity be presented.'" Matter of J.D., 97 Mass. App. Ct. at 19, quoting Matter of G.P., 473 Mass. at 126. The petitioner must show that the risk of harm is imminent, "that the harm will materialize in the reasonably short term -- in days or weeks rather than in months." Matter of G.P., supra at 128. See Commonwealth v. Nassar, 380 Mass. 908, 916-917 (1980).

2. Evidence demonstrating likelihood of serious harm. First, C.B. argues that BSH did not present sufficient evidence to support a finding beyond a reasonable doubt he posed a "likelihood of serious harm" if not confined to the strict security of BSH. G. L. c. 123, § 8 (b). "In our review of the sufficiency of the evidence, we accept the findings of fact made by the hearing judge unless clearly erroneous; however, we review without deference whether the legal standard for civil commitment was met." Matter of J.P., 486 Mass. at 121. Upon review, we agree with C.B. and conclude that the evidence was insufficient to show beyond a reasonable doubt that C.B. posed a "likelihood of serious harm." G. L. c. 123, § 8 (b).

BSH primarily relied on Dr. Kelley's expert testimony, credited by the judge hearing the petition, in establishing the "likelihood of serious harm." G. L. c. 123, § 8 (b). In her expert testimony, Dr. Kelley opined that failure to hospitalize

9

C.B. at BSH "would create a serious risk of harm to others by reason of mental illness." The only basis in her testimony, however, for her conclusion that there was a risk of violence from C.B. was the fact that he had been charged with violent crimes. Her testimony about his mental health condition and its symptoms included information about delusion, suspiciousness, defensiveness, guardedness, persecutory thinking, a heightened sensitivity to threats, and that he was unnerved by discussion of certain topics. None of this, nor anything she testified was inherent to his diagnosis, provides any basis for concluding that C.B. presented any danger to others. Nor does the evidence of C.B.'s refusal to acknowledge or treat those symptoms provide such a basis.

Rather, Dr. Kelley relied solely on the criminal charges against C.B. as evidence of C.B.'s violent behavior, and thus as evidence supporting her conclusion that C.B. presented a substantial risk of physical harm to others. Although criminal charges can be considered, such charges must be supported only by probable cause, see Commonwealth v. Stirlacci, 483 Mass. 775, 780 (2020); standing alone, in the absence of other evidence, they are insufficient to prove beyond a reasonable doubt commission of the acts alleged. Where that is the only evidence of violence or even a risk of violence, the evidence was insufficient to prove beyond a reasonable doubt that "the

10

failure to retain [C.B.] in strict custody would create a likelihood of serious harm." G. L. c. 123, § 8 (b). The problem is not, as BSH would have it, an absence of sufficient evidence of "recent overt acts of violence." It is the absence of sufficient evidence of violence altogether, or even a risk of violence.

Because we conclude that BSH did not present sufficient evidence to show C.B. posed a "likelihood of serious harm," G. L. c. 123, § 8 (b), the decision and order of the Appellate Division is reversed. The order dated May 27, 2020, committing C.B. to BSH, is vacated.[7]

So ordered.

By the Court (Rubin, Shin & Singh, JJ.[8]),

Clerk

Entered: April 15, 2026.

---

[7] We In light of our conclusion, we need not and do not address C.B.'s other claims of error.

[8] The panelists are listed in order of seniority.

11